1   Jon Furgison
    LAW OFFICES OF JON FURGISON
2   444 Longfellow Avenue
    Hermosa Beach, CA 90254
3   Tel: 310-356-6890

4
    *Counsel for Plaintiff*
5

6

7

8

9

10                  IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12
    PAUL NEUMANN,
13                                      Case No. _____   C 13   0284
              Plaintiff,
14                                      CLASS ACTION COMPLAINT
         v.
15                                      **JURY TRIAL DEMANDED**
    HEWLETT-PACKARD COMPANY,
16  MARGARET C. WHITMAN, LEO
    APOTHEKER, JAMES T. MURRIN,
17  CATHERINE LESJAK, and MARK
    HURD,
18
              Defendants.
19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................ 1

II.     NATURE OF THE ACTION AND SUMMARY ALLEGATIONS ............................... 1

III.    JURISDICTION AND VENUE .......................................................................... 4

IV.     PARTIES..................................................................................................... 4

        A.      PLAINTIFF ....................................................................................... 4

        B.      DEFENDANTS .................................................................................. 4

V.      THE FRAUDULENT SCHEME RELATING TO AUTONOMY ................................ 9

        A.      H-P'S ANNOUNCEMENT OF THE AUTONOMY ACQUISITION .................... 9

        B.      PUBLIC'S REACTION TO AUTONOMY ACQUISITION AND H-P'S RESPONSE ............ 11

        C.      THE TRUTH CONCERNING THE AUTONOMY ACQUISITION...................... 13

        D.      H-P'S ONGOING FRAUD REGARDING AUTONOMY ............................... 15

                1.      H-P Overpaid for Autonomy........................................ 17

                2.      H-P Mismanaged Autonomy........................................ 18

        E.      MATERIALLY FALSE AND MISLEADING STATEMENTS RELATING TO
                AUTONOMY ................................................................................... 20

        F.      THE TRUTH IS REVEALED ............................................................... 35

VI.     FRAUD SCHEME RELATING TO INTEGRITY AND ITANIUM-BASED
        SERVERS ................................................................................................. 39

        A.      INTEGRITY SERVERS AND RELATIONSHIP TO ITANIUM CHIPS ............... 39

        B.      THE SECRET AGREEMENT WITH INTEL TO CONTINUE THE MANUFACTURE OF
                ITANIUM CHIPS .............................................................................. 40

        C.      THE ORACLE LAWSUIT .................................................................. 41

        D.      H-P'S HEAVY RELIANCE ON INTEGRITY SERVERS FOR PROFITS ........... 42

        E.      FALSE STATEMENTS CONCERNING INTEGRITY AND ITANIUM-BASED
                SERVERS AND H-P'S BUSINESS CRITICAL SYSTEMS UNIT ................... 44

        F.      THE TRUTH ABOUT INTEGRITY AND ITANIUM-BASED SERVERS EMERGES .......... 50

VII.    CLASS ACTION ALLEGATIONS .................................................................... 54

VIII.   PRESUMPTION OF RELIANCE..................................................................... 56

IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR ......................................... 56

X.      CLAIMS FOR RELIEF .................................................................................. 57

        COUNT I VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10(B)-
        5 PROMULGATED THEREUNDER, BASED ON FALSE AND MISLEADING
        STATEMENTS CONCERNING AUTONOMY (AGAINST H-P AND DEFENDANTS
        WHITMAN, APOTHEKER, LESJAK, MURRIN)..................................................... 57

COUNT II VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10(B)-5 PROMULGATED THEREUNDER, BASED ON FALSE AND MISLEADING STATEMENTSCONCERNING INTEGRITY, BUSINESS CRITICAL SYSTEMS AND ITANIUM-BASED SERVERS (AGAINST HURD, APOTHEKER, LESJAK AND MURRIN) .................................................................................... 59

COUNT III VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS .......................................................................... 61

XI.     JURY TRIAL DEMANDED ..................................................................... 62

## I.      INTRODUCTION

1.      Plaintiff Paul Neumann brings this federal securities class action under the Securities and Exchange Act of 1934 (the "Exchange Act"), on behalf of himself and all other persons and entities who purchased Class A common stock of Hewlett Packard Company ("H-P" or the "Company") between February 20, 2008 and November 20, 2012, inclusive (the "Class Period").  This action alleges that H-P and certain members of its senior management – Margaret C. Whitman, Catherine Lesjak, Leo Apotheker, James T. Murrin and Mark Hurd ("Individual Defendants") – concealed material information and made false and misleading statements relating to H-P's business and financial condition, and violated generally accepted accounting principles ("GAAP") in accounting for the Company's revenues, income, and accounts receivable, all of which had the effect of artificially inflating the price of H-P's Class A common stock during the Class Period and violated the Securities Exchange Act of 1934 ("Exchange Act").

2.      The allegations in this Complaint are based upon information and belief, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge. Plaintiff bases his belief upon information uncovered through an investigation conducted by and under the supervision of Plaintiff's attorney into the facts and circumstances alleged herein. This investigation included, among other things: review of H-P's filings with the Securities and Exchange Commission ("SEC"); review of H-P's press releases and other public statements; and review of regulatory filings and reports, court filings, Congressional investigation materials, securities analysts' reports, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.     NATURE OF THE ACTION AND SUMMARY ALLEGATIONS

3.      This is a class action securities fraud complaint alleging violations of the Securities Exchange Act of 1934 against defendants for their false and misleading statements made in connection with and as a result of its acquisition of Autonomy Corporation plc ("Autonomy") and also in connection with the future business prospects for one of its key

1   profit drivers, its Integrity servers. As a result of these false and misleading statements, H-P's
2   shareholders have suffered billions of dollars in damages.

3       4.    Autonomy is a British company that supplies software that analyzes
4   unstructured data, such as emails, online videos, and web-surfing, for patterns. Its clients
5   include government agencies, who might be searching for nefarious activity, and companies
6   who are looking for new marketing opportunities. On August 19, 2011, H-P announced that it
7   had reached an agreement to purchase Autonomy for approximately $11.1 billion ("Autonomy
8   Acquisition"). Approximately one year later, on November 20, 2012, H-P announced that it
9   would have to write-down goodwill and tangible assets related to the Autonomy Acquisition in
10  the amount of $8.8 billion. H-P attributed this shocking news to "serious accounting
11  improprieties, disclosure failures, and outright misrepresentations at Autonomy Corporation
12  plc." However, the true cause of the write-down was actually H-P's mismanagement of the
13  Autonomy business and its overpayment for the business at the time of the Acquisition. This
14  attempt to shift the blame to Autonomy and its former Chief Executive Officer ("CEO"),
15  defendant Michael R. Lynch ("Lynch") and on its accountants is an effort to further the fraud
16  and escape liability for H-P's own fraudulent misconduct.

17      5.    H-P shareholders have suffered substantial damages in connection with H-P's
18  false and misleading statements concerning the Autonomy Acquisition, which include
19  misrepresenting the due diligence that H-P performed prior to the Autonomy Acquisition;
20  overstating the alleged benefits that the Autonomy Acquisition would provide to H-P;
21  misleading investors about the value of Autonomy's goodwill and intangible assets; and
22  finally, falsely blaming disappointing results from Autonomy on faulty accounting practices at
23  Autonomy, rather than accepting blame for its mismanagement of Autonomy.

24      6.    H-P's fraudulent conduct was not limited to misleading investors about the
25  value and prospects of Autonomy. H-P also committed fraud with respect to its Integrity line
26  of servers, which historically accounted for a large percentage of its profits. The Integrity
27  servers run on the Itanium chip, which is manufactured by Intel Corporation ("Intel"). In
28  addition, Oracle Corporation ("Oracle") makes software which runs on the Integrity servers.

2

1  Without Intel's manufacture of the Itanium chip, or Oracle's development of compatible

2  software, H-P's Integrity servers would be useless.  Oracle and Intel apparently saw the

3  impending obsolescence of Itanium-based servers and any related businesses, and thus they

4  sought to cease manufacture and development of their Itanium-based chips and compatible

5  software products.

6        7.     During the Class Period, H-P publicly touted the growth aspects of Integrity,

7  even though it had knowledge that Intel had wanted to cease making the Itanium chips, and

8  that the Integrity line of servers would soon become obsolete.  Furthermore, when it began to

9  witness a softening of the market's appetite for Itanium-based servers, H-P continued to state

10 its commitment to its Integrity servers.  In the early periods where H-P's Integrity-based

11 revenues were declining, H-P blamed such declines on external factors including a weak

12 economy and the launch of a new line of its Itanium-based servers, the Integrity SuperDome.

13       8.     H-P had good reason to conceal the impending obsolescence of its Itanium-

14 based servers.  They were responsible for as much as 15% of the profits to H-P's bottom line

15 because of the associated, high-profit service contacts that usually accompanied sale of the

16 Integrity servers.  Thus, if H-P were to admit that Integrity servers were facing obsolescence, it

17 would have had to admit that a huge percentage of its profits would be vanishing along with

18 Integrity, and with no heir apparent to take its place.  When H-P finally revealed the truth

19 about problems with its Integrity servers *and the resulting impact on its profit margins*, the

20 price of H-P's stock declined dramatically.

21       9.     During the Class Period, H-P was forced to report declining profits, much of

22 which resulted from the fact that it was losing business from the declining sales of Integrity

23 servers and from the fact that the Autonomy Acquisition was failing to live up to Defendants'

24 statements.  As the public learned of information that called into question the rosy picture

25 Defendants were painting, the market's reaction to those disclosures caused the stock price to

26 drop.  In all, investors saw the Company's stock price decline approximately 79% during the

27 time of the fraudulent scheme which ran from February 20, 2008 until November 20, 2012,

28 from a high of $54.52 on April 14, 2010, to a close of $11.71 on November 20, 2012, resulting

1   in a market capitalization loss in excess of $94 billion at a time when the overall market was,

2   in most instances, increasing. The decline in H-P's stock price during the Class Period was a

3   result of the public disclosure of facts that had previously been misrepresented or concealed by

4   Defendants in violation of the securities laws. In this action, Plaintiff seeks to recover on

5   behalf of himself and all others similarly situated the substantial investment losses that were

6   caused by Defendants' misconduct.

7   **III.   JURISDICTION AND VENUE**

8   10.   The claims asserted herein arise under and are pursuant to Sections 10(b), 20(a),

9   and 20A of the Exchange Act [15 U.S.C. §§ 78j(b), 78t(a) and 78t-1] and Rule 10b-5

10  promulgated thereunder by the Securities and Exchange Commission [17 C.F.R. § 240.10b-5].

11  11.   This Court has jurisdiction over the subject matter of this action pursuant to 28

12  U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

13  12.   Venue is proper in this District pursuant to Section 27 of the Exchange Act, and

14  28 U.S.C. § 1391(b). H-P maintains its principal place of business in this District and many of

15  the acts and practices complained of herein occurred in substantial part in this District.

16  13.   In connection with the acts alleged in this Complaint, Defendants, directly or

17  indirectly, used the means and instrumentalities of interstate commerce, including, but not

18  limited to, the mails, interstate telephone communications and the facilities of the national

19  securities markets.

20  **IV.   PARTIES**

21  **A.   PLAINTIFF**

22  14.   Plaintiff Paul Neumann is an individual residing in South Miami, FL. He

23  purchased common stock of H-P at artificially inflated prices during the Class Period.

24  **B.   DEFENDANTS**

25  15.   Defendant Hewlett Packard Company is a Delaware corporation with its

26  principal place of business located at 3000 Hanover Street, Palo Alto, California. H-P was

27  incorporated in 1947 and bills itself as a "leading global provider of products, technologies,

28  software, solutions and services to individual consumers, small- and medium-sized businesses

4

and large enterprises, including customers in the government, health and education sectors." H-P provides personal computing and other access devices; multi-vendor customer services, including infrastructure technology and business process outsourcing, technology support and maintenance, application development and support services and consulting and integration services; imaging and printing-related products and services; and enterprise information technology infrastructure including enterprise server and storage technology, networking products and solutions, information technology management software, information management solutions and security intelligence/risk management solutions. In its most recent SEC filing, H-P stated it is organized into seven business segments: Personal Systems; Printing; Services; Enterprise Servers Storage and Networking ("ESSN"); Software, HP Financial Services; and Corporate Investments.

16. Defendant Margaret C. Whitman ("Whitman") has served as the President and Chief Executive Officer since September 22, 2011. She has also served as a member of the Board of Directors of H-P since January 2011. Whitman assisted in the preparation and/or approval of H-P's SEC filings, including but not limited to H-P's Forms 10-Q and 10-K, and she signed the Company's Forms 10-K for the fiscal year ending October 31, 2011, filed with SEC on December 27, 2011 and for the fiscal year ending October 31, 2012, filed with the SEC on December 27, 2012. She also made statements in various investor conference calls held in the time period surrounding H-P's announcements of its quarterly earnings on November 21, 2011, February 22, 2012, May 23, 2012, August 22, 2012 and November 20, 2012.

17. Defendant Catherine A. Lesjak ("Lesjak") has served as the Executive Vice President and Chief Financial Officer of H-P since January 2007. Lesjak also served as H-P's interim Chief Executive Officer from August 2010 until November 2010. In total, Ms. Lesjak has been employed at H-P for more than twenty-four years in various financial leadership capacities. Lesjak assisted in the preparation and/or approval of H-P's SEC filings, including but not limited to the Forms 10-Q and 10-K for the periods ended February 19, 2008, May 20, 2008, August 19, 2008, November, 2008, February 18, 2009, May 19, 2009, August 18, 2009,

November 23, 2009, February 17, 2010, May 18, 2010, August 19, 2010, November 22, 2010, February 22, 2011, May 17, 2011, August 18, 2011, November 21, 2011, February 22, 2012, May 23, 2012, August 22, 2012 and November 20, 2012. Ms. Lesjak also signed the Company's Forms 10-K for the fiscal year ending October 31, 2008, filed with SEC on December 17, 2008; for the fiscal year ending October 31, 2009, filed with the SEC on December 17, 2009; for the fiscal year ending October 31, 2010, filed with the SEC on December 15, 2010; for the fiscal year ending October 31, 2011, filed with the SEC on December 14, 2011; and for the fiscal year ending October 31, 2012, filed with the SEC on December 27, 2012. Ms. Lesjak also made public statements about the Company in various investor conference calls held in the time periods surrounding H-P's announcement of its quarterly earnings on February 19, 2008, May 20, 2008, August 19, 2008, November, 2008, February 18, 2009, May 19, 2009, August 18, 2009, November 23, 2009, February 17, 2010, May 18, 2010, August 19, 2010, November 22, 2010, February 22, 2011, May 17, 2011, August 18, 2011, November 21, 2011, February 22, 2012, May 23, 2012, August 22, 2012 and November 20, 2012.

18.     Defendant James T. Murrin ("Murrin") has been H-P's Senior Vice President and General Manager of the end-user workplace and managed network services business within H-P's Enterprise Services business since March 2012. He also served as H-P's Senior Vice President, Controller and Principal Accounting Officer from March 2007 to May 2012. Mr. Murrin assisted in the preparation and/or approval of H-P's SEC filings, including but not limited to the Forms 10-Q and 10-K for the periods ended February 19, 2008, May 20, 2008, August 19, 2008, November , 2008, February 18, 2009, May 19, 2009, August 18, 2009, November 23, 2009, February 17, 2010, May 18, 2010, August 19, 2010, November 22, 2010, February 22, 2011, May 17, 2011, August 18, 2011, November 21, 2011, February 22, 2012, May 23, 2012, August 22, 2012 and November 20, 2012. Mr. Murrin also signed the Company's Forms 10-K for the fiscal year ending October 31, 2008, filed with SEC on December 17, 2008; for the fiscal year ending October 31, 2009, filed with the SEC on December 17, 2009; for the fiscal year ending October 31, 2010, filed with the SEC on

December 15, 2010; and for the fiscal year ending October 31, 2011, filed with the SEC on December 14, 2011. While in possession of material non-public information concerning H-P's true business health, defendant Murrin sold 132,500 shares of his H-P stock for $3,447,373 in proceeds.

19.    Defendant Leo Apotheker ("Apotheker") was the CEO, President and a director of H-P from November 30, 2010 until September 22, 2011. Defendant Apotheker assisted in the preparation and/or approval of H-P's SEC filings, including but not limited to H-P's Forms 10-Q and 10-K, and he signed the Company's Forms 10-K for the fiscal year ending October 31, 2010, filed with SEC on December 15, 2010. He also made statements in various investor conference calls held in the time period surrounding H-P's announcements of its quarterly earnings on February 22, 2011, May 17, 2011 and August 18, 2011.

20.    Defendant Mark Hurd ("Hurd") served as the CEO of H-P from January 2005 until his departure on August 6, 2010. Defendant Hurd assisted in the preparation and/or approval of H-P's SEC filings, including but not limited to H-P's Forms 1o-Q and 10-K, and he signed the Company's Forms 10-K for the fiscal years ending October 31, 2008 and October 31, 2009, filed with the SEC on December 18, 2008 and December 18, 2009. He also made statements in various investor conference calls held in the time period surrounding H-P's announcements of its quarterly earnings on February 19, 2008, May 20, 2008, August 19, 2008, November, 2008, February 18, 2009, May 19, 2009, August 18, 2009, November 23, 2009, February 17, 2010, May 18, 2010, August 19, 2010 and November 22, 2010.

21.    Defendants Whitman, Lesjak, Murrin, Apotheker, and Hurd are collectively referred to herein as the "Individual Defendants." The Individual Defendants and H-P are collectively referred to herein as the "Defendants."

22.    During the Class Period, the Individual Defendants, by virtue of their senior executive positions at H-P, were privy to confidential and proprietary information concerning H-P and its operations, financial condition and present and future business prospects. They had access to such information via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or

1  board of directors meetings and committees thereof, and via reports and other information

2  provided to them.   Among other information, the Individual Defendants had access to

3  materially adverse non-public information concerning the overpayment for Autonomy and the

4  fact that its true benefits to H-P could never approach those that were being publicly touted, as

5  well as on public information concerning the fact that the Integrity servers were facing

6  obsolescence, particularly in light of Intel's preference to stop making Itanium chips.  Because

7  of their possession of such information, the Individual Defendants knew or recklessly

8  disregarded that the adverse facts specified herein had not been disclosed to, and were being

9  concealed from, the investing public.

10      23.     The Individual Defendants, because of their positions with the Company,

11  controlled and/or possessed the authority to control the contents of its reports, press releases

12  and presentations to securities analysts.  They were provided with copies of the Company's

13  SEC filings, reports, press releases, and other statements alleged herein to be false and

14  misleading, prior to or shortly after their issuance and had the ability and opportunity to

15  prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the

16  opportunity to prevent as well as commit the fraudulent acts alleged herein.

17      24.     Moreover, each of the Individual Defendants signed one or more SEC filings

18  that are alleged herein to be false or misleading in material respects.  By signing these SEC

19  filings, the Individual Defendants personally attested to the accuracy of their content, and

20  assumed a duty to disclose adverse facts that undermined the statements contained therein.

21      25.     As senior executives of a publicly traded company whose common stock is

22  registered with the SEC pursuant to the Exchange Act and is traded on the New York Stock

23  Exchange and governed by the federal securities laws, the Individual Defendants had a duty to

24  promptly disseminate accurate and truthful information with respect to  H-P's financial results,

25  growth, operations, and present and future business prospects, and to correct any previously

26  issued statements that were or had become materially misleading or untrue, so that the market

27  price of H-P's common stock would be based upon truthful and accurate information.  The

28

Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## V. THE FRAUDULENT SCHEME RELATING TO AUTONOMY

### A. H-P'S ANNOUNCEMENT OF THE AUTONOMY ACQUISITION

26. On August 18, 2011, the Company announced that it was going to purchase Autonomy, a British company that supplies software that analyzes unstructured data, such as emails, online videos and web-surfing, for patterns. Autonomy's software is sold primarily to corporations and government intelligence agencies that look for patterns of lucrative or nefarious activity. For example, companies use its software to analyze marketing patterns to determine where to allocate marketing resources. Some of its larger customers included Oracle, Adobe and Cisco.

27. H-P paid approximately $11.1 billion to acquire Autonomy, consisting of cash paid for outstanding common stock, convertible bonds, vested in-the-money stock awards and the estimated fair value of earned unvested stock awards assumed by H-P. H-P recorded approximately $6.6 billion of goodwill and amortizable purchased intangible assets of $4.6 billion. The Autonomy purchase was conceived of by H-P's then-CEO, Leo Apotheker, who was known to have been a good friend of Mike Lynch, the founder of Autonomy. (Lynch made $800 million in the deal.) Just one month following the announcement of the Acquisition, and prior to its close, Apotheker was ousted from H-P, and Lynch, who had been hired by H-P following the Autonomy acquisition, left H-P in May 2012.

28. Over the vehement objection of at least one upper management H-P insider, Defendant Lesjak (who served as acting CEO after Apotheker's ouster and is the current Chief Financial Officer), the H-P Board unanimously approved the Autonomy acquisition, which closed on October 3, 2011, under the tenure of the current CEO, Defendant Whitman.

29. The Autonomy Acquisition was announced in a press release dated August 18, 2011. It stated in part:

> Autonomy presents an opportunity to accelerate our strategic vision to decisively and profitably lead a large and growing space", said Leo Aotheker, HP president

and chief executive officer.  "Autonomy brings to HP higher value business solutions that will help customers manage the explosion of information.  Together with Autonomy, we plan to reinvent how both unstructured and structured data is processed, analyzed, optimized, automated and protected.  *Autonomy has an attractive business model, including a strong cloud based solution set, which is aligned with HP's efforts to improve our portfolio mix.  We believe this bold action will squarely position HP in software and information to create the next-generation Information Platform, and thereby, create significant value for our shareholders.*

Apotheker continued, "Autonomy is a highly profitable and globally respected software company, with a well-regarded management team and talented, dedicated employees.  We look forward to partnering with a company who shares our commitment to solving customer problems by creating smart, cutting-edge products and solutions.  I am particularly pleased that Dr. Mike Lynch, who heads a team of brilliant scientists and employees, will continue to lead Autonomy.  I look forward to our collaboration as we focus on creating maximum value for the combined company, its customers and employees.

"This is a momentous day in Autonomy's history," said Dr. Mike Lynch, chief executive officer and founder, Autonomy.  "From our foundation in 1996, we have been driven by one shared vision:  to fundamentally change the IT industry by revolutionizing the way people interact with information.  HP shares this vision and provides Autonomy with the platform to bring our world-leading technology and innovation to a truly global stage, making the shift to a future age of the information economy a reality.

30.     The Autonomy Acquisition was discussed during an analyst call to report quarterly earnings on August 19, 2011.  Apotheker touted Autonomy as "the leading enterprise information management software company specialized in unstructured data."  He further stated that in 2010, "Autonomy had gross margins in the high 80s and operating margins above 40%.  They have demonstrated a strong consistent track record of double-digit revenue growth."  He also stated that "the acquisition of Autonomy will build" on the momentum of H-P's software business and "accelerate our H-P Software strategy."  Finally, in response to a question from an analyst, Apotheker stated that "Autonomy as a business has a very profitable financial model with a very compelling value proposition . . . . Autonomy has grown its revenues at a compound annual growth rate of approximately 55% and adjusted operating profit at the rate of approximately 83% over the last 5 years.  We're buying a very strong business and we believe that we can extract a lot more out of this business by combining it

with H-P."  H-P stated that the Autonomy purchase was key to its transformation into a higher-margin seller of software.

        **B.**    **PUBLIC'S REACTION TO AUTONOMY ACQUISITION AND H-P'S RESPONSE**

      31.    Despite H-P's optimism concerning Autonomy, the market displayed skepticism that Autonomy was worth the high price tag H-P agreed to pay, or that it could provide the benefits as H-P was touting.  Investment bankers had been shopping Autonomy for some time before H-P agreed to purchase it, but no buyer would pay anywhere near the price Autonomy was seeking based on the financial data.  One anonymous insider at Oracle, which declined to purchase Autonomy, has stated that Oracle's analysts "couldn't figure out where the numbers came from.  And taking the numbers at face value, even at $6 billion it was overvalued."

      32.    According to the *New York Times*, even Autonomy insiders believed H-P was overpaying for the Acquisition.  Thus, when H-P announced the Acquisition, it "didn't stress the price – $11.1 billion, or an eye-popping multiple of 12.6 times Autonomy's 2010 revenue – but focused on Autonomy's potential to transform H-P from a low-margin producer of printers, PCs and other hardware into a high-margin, cutting-edge software company."

      33.    Furthermore, as noted above, Lesjak strongly opposed the Acquisition internally.  According to the *New York Times*, she made "an impassioned presentation to the [H-P] board and argued that the deal wasn't in the best interests of shareholders."  She also refused to appear at a road show meant to defend the deal and the exorbitant price H-P had committed to pay.  Despite her qualms concerning the Acquisition, Lesjak failed to inform investors of her concerns, and instead chose to assure investors that the Autonomy Acquisition made sound business sense.

      34.    The market had a strong, negative reaction to the news, which, along with other announcements on the same day described herein, sent the price of H-P stock down 20 percent.

      35.    To quell criticism, Apotheker spoke at a Deutsche Bank Technology Conference a few days after the announcement of the Acquisition, on September 13, 2011:

[APOTHEKER:]   Autonomy – I'm sure we have many more questions on Autonomy, but, just to position that squarely in everybody's minds, the idea around Autonomy is to really strengthen HP's capabilities tremendously in this whole notion of data.  We talked about data in San Francisco.  We will talk a lot about data, probably, today, as well, structured and unstructured.  And, therefore, Autonomy is a very important asset.

***

And let me just try to build on that and help you understand how we came to the valuation of Autonomy.  ***We have a pretty rigorous process inside HP that we follow for all of our acquisitions, which is a DCF-based model, and we try to take a very conservative view at this.  Just to make sure everybody understands. Autonomy will be, on day one, accretive to HP.  For FY 2012, Autonomy, once we integrate it, is accretive to HP.***

***Now, we have identified five synergy possibilities – five synergy leverages on how we can build up the Autonomy business and how we can synergize it between HP and Autonomy.  And I can walk you through that, through these various elements.  But just take it from us.  We did that analysis at great length, in great detail, and we feel that we paid a very fair price for Autonomy.  And it will give a great return to our shareholders.***

36.     Apotheker's comments sought to reassure investors against the criticism of H-P for making the Autonomy Acquisition.  However, at least one investor has recently asked the chairman of the Board, Ray Lane, about the discounted cash flow analysis; Lane was unfamiliar with such an analysis but reiterated his support of the deal.

37.     Shortly after the announcement of the Acquisition, and just nine days after making the statements at the Deutcshe Bank conference, Apotheker was fired by the Board on September 22, 2011.  According to an anonymous Autonomy executive who spoke to the *New York Times*, rumors had been swirling that H-P was trying to break free from the deal, and had even attempted to find accounting improprieties to justify a withdrawal, but was unable to do so.

38.     H-P continued to tout the benefits of Autonomy in the wake of the Acquisition. During H-P's Q4 2011 earnings call on November 21, 2011, which was led by Whitman and Lesjak, Whitman stated that H-P:

closed the Autonomy acquisition on October 3.  In the last month, we've had hundreds of leads passed between the two companies, and we've created a new information management business group that combines Autonomy, Vertica, and other H-P software assets under Mike Lynch . . .

12

Well let me just spend a moment on Autonomy.  I am really excited about this acquisition.  As you all know, I think it really positions H-P as a leader in the Next-generation information management and analytics capabilities, as the explosion of data is making these capabilities absolutely critical.  Autonomy is a unique asset.  It has a remarkable ability to manage unstructured information in a way that no one else in the market does.  I think that adds a lot of value not only in their space but actually across H-P.

39.     Autonomy's results are reported as part of H-P's "Software" segment.  During H-P's Q1 2012 earnings call on February 22, 2012, Whitman reported that Software revenue grew 30% year-over-year "with the addition of Autonomy," and proclaimed that the "Autonomy acquisition is going well."  She also stated that Autonomy would help H-P's entire portfolio including H-P's enterprise and services group, as well as "other software assets."

## C.     THE TRUTH CONCERNING THE AUTONOMY ACQUISITION

40.     In reality, Autonomy was not performing up to H-P's public statements, and news of its disappointing performance began to seep into the market.  For example, in the Q2 2012 earnings call on May 23, 2012, Defendant Whitman acknowledged that Autonomy's revenues were "very disappointing," despite a 22% year-over-year increase in Software's revenues.  Ms. Whitman continued to highlight Autonomy's prospects, stating that "[t]he market and competitive position for Autonomy remains strong, particularly in cloud offerings, and we have been flooded with a number of big deal leads.  Bill [Veghte, H-P's Chief Strategy Officer who replaced Lynch as the Autonomy leader] is an experienced software leader, who will develop the right processes and discipline to scale Autonomy and fulfill its promise, although it will take a few quarters to see tangible improvement.

41.     During H-P's Q3 2012 earnings call on August 22, 2012 (which occurred shortly after H-P's August 8, 2012 announcement of an $8 billion write down associated with its "Services" segment, which in actuality relates to its acquisition of Electronic Data Services ("EDS"), another misguided purchase on H-P's part[1]), Defendant Whitman stated:  "Autonomy

---

[1] In a Form 8-K Filed on August 8, 2012, H-P announced that it "expects to record a non-cash pre-tax charge for the impairment of goodwill within its Services segment of approximately $8 billion in the third quarter of its fiscal 2012."

still requires a great deal of attention and we've been aggressively working on that business. Among the many changes we've instituted is a global dashboard to track Autonomy's pipeline . . . . These actions are designed to help deliver predictable results and improve after-sale customer satisfaction."   During this call, Whitman also announced that H-P "crossed an important milestone with Autonomy Live Vault, [its] Cloud-based data protection service for content archiving, passing the 10,000 customer mark during the quarter."   Thus, although H-P was acknowledging some problems with Autonomy, as recently as August 22, 2012, H-P was assuring investors that Autonomy was a sound acquisition.

42.   On November 20, 2012, the Company announced that it had uncovered "serious accounting improprieties" and "outright misrepresentations" at Autonomy, and that it would have to take an $8.8 billion write-down related to Autonomy, which wiped out its profit, resulting in announcement of a $6.9 billion loss for the quarter.   $5 billion of the $8.8 billion write down allegedly was attributable to the purported accounting issues and the remainder was blamed on Autonomy's disappointing performance:

> HP today announced a non-cash impairment charge of $8.8 billion related to Autonomy in the fourth quarter of its 2012 fiscal year. The majority of this impairment charge, more than $5 billion, is linked to serious accounting improprieties, misrepresentation and disclosure failures discovered by an internal investigation by HP and forensic review into Autonomy's accounting practices prior to its acquisition by HP. The balance of the impairment charge is linked to the recent trading value of HP stock and headwinds against anticipated synergies and marketplace performance

43.   Upon news of the problems at Autonomy the price of H-P's stock dropped 12%, to close at $11.71 per share on November 20, 2012, the lowest price since 2002.

44.   Shortly after the Company announced the write down, John Schultz, H-P's general counsel, stated that more than $200 million in revenue at Autonomy had been accelerated, mischaracterized and simply made up over a two year period beginning in 2009. This accounted for approximately 12% of Autonomy's $1.61 billion revenue in 2009 and 2010.

45.   According to the Company, the accounting improprieties at Autonomy were first discovered when a whistleblower (described by H-P as a "very senior person") came forward soon after Lynch left H-P in May 2012.  This individual met with Schultz and showed

him emails and financial information to substantiate his claims.  H-P initiated an internal investigation led by PricewaterhouseCoopers, to investigate Autonomy sales between the third quarter 2009 and the second quarter 2011, just prior to the Acquisition.

46.    The investigation concluded that accountants at Autonomy had committed several accounting irregularities, which disguised Autonomy's actual costs and the nature of its products.  For example, H-P now claims that, in some instances, Autonomy booked sales of hardware as software to conceal the higher costs associated with hardware sales and inflate the margins on those sales.  One H-P official, who spoke to the *New York Times* anonymously, stated that hardware was actually sold at a 10% loss, but that loss was disguised as a marketing expense.  H-P also claims that Autonomy took licensing revenue upfront before receiving any money, which improperly inflates gross profit margins, and there are incidents of resellers reporting sales that did not exist.  H-P says that all of these improprieties mean that Autonomy's reported profit margins of between 40-45% were actually between 20-28%.

47.    Defendant Whitman called Autonomy's accounting improprieties a "willful sustained effort" to inflate its revenues leading up to the acquisition.  During the investor conference call in which the write down was announced, Whitman stated, "We did a whole host of due diligence but when you're lied to, it's hard to find."  She also stated that Autonomy "was smaller and less profitable than we had thought."

### D.    H-P'S ONGOING FRAUD REGARDING AUTONOMY

48.    While H-P has claimed it had no idea of the accounting improprieties at Autonomy, according to an article in *The Wall Street Journal* dated November 20, 2012 H-P's claimed innocence is negated by reports that "[e]ven before H-P announced its acquisition of the software maker in August 2011, rumors swirled that Autonomy's growth was due partly to fuzzy accounting."  The article also reports, "[a] dossier questioning some of Autonomy's growth was widely circulated around the time that the acquisition by H-P was announced." The *Wall Street Journal* further reported that "[a]t least one year before the H-P acquisition, an Autonomy executive brought concerns about the company's accounting practices to U.S. regulators including the SEC, according to people familiar with the matter."  However,

1   Autonomy did not trade on domestic exchanges at that time, and the SEC likely did not have

2   jurisdiction over the matter.  The *Wall Street Journal* goes on to report that "H-P's internal

3   team was aware of talk about accounting irregularities at the time the deal was struck, people

4   familiar with the matter have said.  At the time, one of these people said, ***H-P was looking for***

5   ***a way to unwind the deal before it closed, but couldn't find any material accounting issues***."

6   (Emphasis added.)

7        49.    There are also questions about how H-P could have missed the accounting

8   errors considering the vast amount of due diligence that occurred prior to the acquisition.

9   Lynch stated, "I can't understand how you can write down $9 billion of value and say

10   somehow this was all caused by something you didn't notice when you did due diligence with

11   300 people.  It would be kind of a big elephant to have missed."  H-P has not provided

12   particularly compelling explanations for questions about how it could have missed the

13   accounting improprieties in its due diligence.  H-P has said only that some documents were not

14   placed in the appropriate places by Autonomy, and to uncover the fraud would have required

15   an examination in "every nook and cranny."

16        50.    Deloitte LLP ("Deloitte") had been Autonomy's regular auditor, and audited

17   Autonomy's books every quarter.  It examined invoices for every sale over $100,000, plus a

18   random batch for smaller transactions.  Deloitte has denied any knowledge of improprieties.

19   KPMG was also hired for purposes of the deal to examine Autonomy's books and review the

20   work Deloitte performed.

21        51.    In addition to insider concerns about Autonomy's accounting as described

22   above, several analysts were publicly skeptical of Autonomy's accounting prior to the

23   Acquisition.  One industry analyst, Alan Pelz-Sharpe of London, covered Autonomy when it

24   was publicly traded in Britain.  He noted that Autonomy's "crown jewel" is a server called

25   IDOL (for Intelligent Data Operating Layer).  He saw numerous IDOL deals being done, not

26   by Autonomy, but by its competitors.  Another analyst who covered Autonomy was Daud

27   Khan at Berenberg Bank.  He said he "suspected that there was an issue around revenue

28   recognition, reported organic growth rates and the true underlying margins of the business,"

16

and that he thought Autonomy had over-reported its growth rates and aggressively recognized revenue.  John Hempton, the manager of a hedge fund based in Sydney Australia, stated that "[i]t was dead easy to spot that Autonomy's statements weren't right."  He had expressed those concerns at a presentation in New York in October, prior to H-P's announcement.  One other firm, Kynikos Associates founded by James Chanos, had written a detailed report in July 2009 criticizing Autonomy's accounting.

52.     Furthermore, a purported $200 million accounting error does not support a $5 billion write-down.  Even if all of the write-down was directly related to earnings (and assuming it amounted to $100 million per year for 2 years), H-P would have had to have a PE Ratio of more than 50 to support a decline in value of $5 billion – which simply is not the case.

53.     Indeed, there are other explanations for H-P's decision to write down the majority of the Autonomy purchase price, and the alleged accounting improprieties reported by H-P are actually a cover-up for *H-P's* nefarious activity including: (i) its misguided decision to pay $11.1 billion for Autonomy and (ii) its poor management of Autonomy.  Thus, even the announcement concerning the write-down of Autonomy is itself another step in the fraudulent scheme to conceal its prior misrepresentations concerning Autonomy.

## 1.     H-P Overpaid for Autonomy

54.     H-P knew from the outset that the Autonomy Acquisition was far riskier than it was indicating in its public statements.  Sometime in the process of closing the deal, H-P became aware that they had indeed overpaid.  However, H-P did not want to disclose that fact, particularly in light of the extensive external criticism prior to the deal closing, and even vocal opposition from within its upper management, including Defendant Lesjak.  H-P is still trying to hide its misjudgment and early misstatements concerning Autonomy.  Thus, H-P decided to deflect criticism by claiming that Autonomy defrauded H-P.

55.     There is ample evidence that H-P did, indeed overpay for Autonomy.  In addition to noting difficulties that Autonomy had in obtaining a buyer noted above, and making comments on the inflated price, many industry insiders criticized H-P for paying too much when the Acquisition was announced.  An analyst at Forrester Research stated that "H-P

thought [Autonomy] was an entirely new platform, but Autonomy's clients said it wasn't as good as Google's corporate search product." The analyst pointed out that Autonomy was not attuned to "new kinds of search signals, like what your friends are doing, what people like you are doing." She stated that Autonomy "didn't invest in R&D; they didn't have regular software releases; they weren't transparent with a road map of where they were going; they didn't seek customer feedback."

56.    In addition, Defendant Lesjak's opposition to the Acquisition also supports the fact that H-P overpaid for Autonomy.

57.    Defendant Lesjak's vocal opposition to the Acquisition, made known to the entire H-P Board, as well as the Company's own efforts to unwind the deal once Defendant Whitman became the CEO demonstrate that H-P's insiders had actual knowledge, or at a minimum recklessly the fact that H-P was overpaying for Autonomy.

## 2.    H-P Mismanaged Autonomy

58.    Another reason H-P needed to write down the Autonomy Acquisition was to cover up its poor management of Autonomy. Since the announcement of the $8.8 billion write down, Lynch has vehemently denied any problems at Autonomy, granting interviews to several media outlets including the *Wall Street Journal* and *Business Insider*. In statements that have been described as "unusually candid and vocal," Lynch stated that he was "blindsided by a public relations onslaught by H-P, little of which had to do with the substance of its claims about Autonomy," thus suggesting that the news about Autonomy was cover up for H-P's overall poor performance. Lynch stated that the reason for Autonomy's failure is the fact that H-P management "drove out the top 100 people from Autonomy, and a bunch of trainees were put in" to the sales force. Lynch told the *Wall Street Journal* that "[t]he only concept I have of [how H-P arrived at the write down] is that it does seem to be coincident with them releasing the worst set of results in their 70-year history."

59.    On November 27, 2012, Lynch took his defense of Autonomy's accounting one step further by issuing a public letter to H-P, in which he demanded that H-P explain its allegations: "Having no details beyond the limited public information provided last week, and

still with no further contact from you, I am writing today to ask you, the board of Hewlett-Packard, for immediate and specific explanations for the allegations Hewlett-Packard is making," he wrote. H-P responded with a statement that it would rely on the legal process and the investigative authorities (the SEC and Britain's Serious Fraud Office) to uncover and divulge the facts.

60. Lynch's statements thus indicated that H-P had been mismanaging Autonomy in such a way that it would never achieve the profitability or synergistic benefits that H-P touted upon announcement of the Acquisition and consistently thereafter. Therefore, those statements concerning the profitability and synergism of the Autonomy Acquisition were false and misleading.

61. Lynch also stated that he had not heard anything about H-P's internal investigation led by PricewaterhouseCoopers. He claims he has not spoken with H-P since June 2012, when he had a conversation with Whitman that lasted approximately one hour. He said H-P did not raise concerns about accounting issues at Autonomy during that meeting. Lynch's statement further supports that H-P's internal investigation and statements concerning accounting improprieties that occurred at Autonomy prior to the Acquisition were a cover-up for H-P's own fault, including its overpayment for and mismanagement of Autonomy.

62. Lynch has also challenged the identity of the whistleblower. In an interview with *Business Insider* he stated that

> [t]he strange thing is that there's no one left [at H-P] from the senior management team at Autonomy. What we've been told, and I don't know if this was accurate, but the name I've been given is not an Autonomy person. It's an H-P software person who was brought in a month before I left. If that's true, this whistleblower is not what they've made out to be because they would not have been around at the time when all these things were supposedly happening.

63. Thus, Mr. Lynch believes either the whistleblower was not in a position to make the allegations, or that H-P was outright lying about the identity of the whistleblower. Again, Lynch's position supports the fact that H-P's internal investigation and subsequent statements about the accounting improprieties at Integrity were part of an ongoing fraud designed to hide its own poor decision and mismanagement.

64.   Mr. Lynch's statements concerning H-P's mismanagement, coupled with the fact that concerns were raised about H-P internally in May 2012 demonstrate that H-P's senior management had actual knowledge of, or at a minimum recklessly disregarded, the facts that Autonomy was being mismanaged in such a way that it would not be able to achieve the synergism and profits that had earlier been promised to H-P's shareholders.

**E.   MATERIALLY FALSE AND MISLEADING STATEMENTS RELATING TO AUTONOMY**

65.   During the Class Period, H-P issued the following statements regarding Autonomy, which were false and misleading for the reasons set forth below them.

66.   On August 18, 2011, after the market closed, the Company announced in a press release that it would acquire all of the outstanding shares of Autonomy for £25.50 or $42.11 per share in a cash offer, representing an enterprise value of approximately $11 billion.  The press release stated in relevant part the following:

> The transaction was unanimously approved by the boards of directors of both HP and Autonomy.   The Autonomy board of directors also has unanimously recommended its shareholders accept the Offer.
>
> Based on the closing stock price of Autonomy on August 17, 2011, the consideration represents a one day premium to Autonomy shareholders of approximately 64 percent and a premium of approximately 58 percent to Autonomy's prior one month average closing price.   The transaction will be implemented by way of a takeover offer extended to all shareholders of Autonomy.  A document containing the full details of the Offer will be dispatched as soon as practicable after the date of this release.  The acquisition of Autonomy is expected to be completed by the end of calendar 2011.
>
> ***
>
> "*Autonomy presents an opportunity to accelerate our strategic vision to decisively and profitably lead a large and growing space*," said Léo Apotheker, HP president and chief executive officer.  "*Autonomy brings to HP higher value business solutions that will help customers manage the explosion of information*.   Together with Autonomy, we plan to reinvent how both unstructured and structured data is processed, analyzed, optimized, automated and protected.  Autonomy has an attractive business model, including a strong cloud based solution set, which is aligned with HP's efforts to improve our portfolio mix.  We believe this bold action will squarely position HP in software and

information to create the next-generation Information Platform, and thereby, create significant value of our shareholders."

Apotheker continued, "Autonomy is a highly profitable and globally respected software company, with a well-regarded management team and talented, dedicated employees. We look forward to partnering with a company who shares our commitment to solving customer problems by creating smart, cutting-edge products and solutions. I am particularly pleased that Dr. Mike Lynch, who heads a team of brilliant scientists and employees, will continue to lead Autonomy. I look forward to our collaboration as we focus on creating maximum value for the combined company, its customers and employees."

"This is a momentous day in Autonomy's history," said Dr. Mike Lynch, chief executive officer and founder, Autonomy. "From our foundation in 1996, we have been driven by one shared vision: to fundamentally change the IT industry by revolutionizing the way people interact with formation. HP shares this vision and provides Autonomy with the platform to bring our world-leading technology and innovation to a truly global stage, making the shift to a future age of the information economy a reality.

**Strategic and financial benefits**

- Positions HP as leader in large and growing space: Autonomy has a strong position in the $20 billion enterprise information management space, which is growing at 8 percent annually and is uniquely positioned to continue growth within this space. Furthermore, key Autonomy assets would provide HPA with the ability to reinvent the $55 billion business analytics software and services space, which is growing at 8 percent annually.

- Complements HP's existing technology portfolio and enterprise strategy: Autonomy offers solutions that are synergistic across HP's enterprise offerings and strengthens capabilities for data analytics, the cloud, industry capabilities and workflow management. This will bolster HP's cloud offerings with key assets for information management and data analytics. Autonomy also complements existing HP offerings from enterprise servers, storage, networking, software, services and its Imaging and Printing Group (IPG).

- Provides differentiated IP services and extensive vertical capabilities in key industries: Acquiring Autonomy would provide differentiated IP for services, including extensive vertical capabilities in key industries such as government, financial services, legal, pharmaceutical and healthcare.

- Provides IPG a base for content management platforms: Autonomy provides HP with a content management platform and accelerates a major component of the IPG enterprise strategy to continue its growth of document and content management and higher value commercial printing opportunities.

- Enhances HP's financial profile: Autonomy's strong growth and profit margin profile complements HP's efforts to improve its business mix by focusing on enterprise software and solutions. Autonomy has a consistent track record of double-digit revenue growth, with 87 percent gross margins and 43 percent operating margins in calendar year 2010.

- Accretive to HP's earnings: HP expects the acquisition to be accretive to non-GAAP earnings per share for HP shareholders in the first full year following completion.

67. On August 18, 2011, the Company issued a press release announcing financial results for the third fiscal quarter ended July 31, 2011. For the fourth quarter, the Company reported net earnings of $1.9 billion, or $0.93 diluted earnings per share ("EPS"), and net revenue of $31.2 billion, as compared to net earnings of $1.8 billion, or $0.75 diluted EPS, and net revenue of $30.7 billion for the same period a year ago.

68. Also on August 18, 2011, the Company conducted a conference call with analysts. During the call, Defendant Apotheker represented the following:

This is a milestone moment because there is a very real and concrete need for our customers to address the explosion of unstructured and structured information. Autonomy's intelligent data operating layer is in effect the standard on more than 400 OEMs and is supported by substantial IP. Additionally, the Autonomy platform pulls structured and unstructured data from a broad range of sources.

And they offer their products via both traditional software license and cloud mode.

Autonomy today is one of the largest cloud players of over 30 betabytes of customer information under management by their cloud-based archiving and backup solutions. They have over 25,000 customers globally. Autonomy sees the information transformation and subsequent market opportunity exactly as we do. Moreover, Autonomy's business is well-aligned to HP's effort to change and focus our business mix.

***In 2010, Autonomy had gross margins in the high 80s and operating margins above 40%.*** They have demonstrated a strong consistent track record of double-digit revenue growth. Mike Lynch, Autonomy's Cofounder and CEO, heads a team of brilliant scientists and employees. Additionally, operationally, the 2 companies and cultures will blend together well. Reporting directly to me, Mike will continue to lead Autonomy, which will continue to operate separately so we can keep them focused on their own market momentum, while at the same time they can play a key role in enabling the opportunities we see in the strategy we've outlined for HP.

As an executive who has spent most of my career primarily in software, this is a world I know well.  ***Some acquisitions require heavy lifting, but bringing Autonomy into the HP world will be seamless and highly complementary.  We believe this transaction will unlock synergies, which in Autonomy and the HP Enterprise offerings including ESSN, software services and IPG and across multiple industry verticals.***  We are building a strong HP Software business.  We have done so through successful acquisitions like ArcSight and Fortify.  We have had excellent growth and performance this year from our software unit, so the acquisition of Autonomy will build on that momentum and accelerate our HP Software strategy.

We all have witnessed an increased level of market volatility and especially today.  So you might ask if a move like Autonomy is right in this market.  But the market fluctuations does not change the underlying opportunity, the value proposition of HP and Autonomy and the need to transform HP's business to create a stronger company.  And most importantly, we very strongly believe the transaction will create significant value for our shareholders.

All of the decisive moves I've made provide HP with the most shareholder return, markets where we can demonstrate a sustainable competitive advantage, maximize customer value, deliver on our solutions vision, differentiate with IP and win.

69.     The foregoing statements issued by H-P and Apotheker in connection with the Company's announcement of the Autonomy Acquisition were materially false and misleading because they gave the false impression that Autonomy would create synergistic benefits to H-P and that it was a highly profitable business.  Furthermore, they led investors to believe that Autonomy was worth the $11.1 billion price tag that H-P was paying.  In fact, H-P and its insiders knew or were reckless in disregarding that Autonomy's business would not provide synergistic benefits to or increase the profitability of H-P.  Furthermore, H-P knew or recklessly disregarded the fact that it was overpaying for Autonomy.

70.     On September 9, 2011, H-P filed a quarterly report for the fiscal third quarter ended July 31, 2011 on a Form 10-Q with the SEC, which was signed by Defendant Lesjak and reiterated the Company's previously announced financial results.  In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Apotheker and Lesjak stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

71.     The 10-Q represented the following in relevant part:

We are investing for growth by strengthening our position in our core markets and accelerating growth in adjacent markets in anticipation of market trends, such as cloud computing, unstructured date, data center consolidation and automation, digitization, analytics and IT security.  In addition, in May 2011, we announced that we are going to make changes to our services business, including accelerating portfolio investments in higher value services, enhancing our sales and delivery capabilities, and better aligning our services strategy with HP's overall strategy to better enable us to meet the needs of our customers.  We are also creating innovative new products and developing new channels to connect with our customers.  ***In addition, we have been making focused investments in innovation to strengthen our portfolio of products and services that we can offer to our customers, both through organic investments as well as through acquisitions, including our recently announced offer to acquire all of the issued and to be issued share capital of Autonomy Corporation plc ("Autonomy"). Once completed, the addition of Autonomy is expected to accelerate HP's offerings in cloud-based solutions and software that address the changing needs of businesses and support the IPG enterprise strategy to continue its growth in document and content management.  These investments will allow us to expand in higher margin and higher growth industry segments and further strengthen our portfolio of hardware, software and services.***

72.     The foregoing statements issued by H-P and Lesjak were materially false and misleading because they gave the false impression that Autonomy would create synergistic benefits to H-P and that it was a highly profitable business.  Furthermore, they led investors to believe that Autonomy was worth the $11.1 billion price tag that H-P was paying.  In fact, H-P and its insiders knew or were reckless in disregarding that Autonomy's business would not provide synergistic benefits to or increase the profitability of H-P.  Furthermore, H-P knew or recklessly disregarded the fact that it was overpaying for Autonomy

73.     On September 13, 2011, Defendant Apotheker participated at the Deutsche Bank Technology Conference and represented the following in relevant part:

Autonomy – I'm sure we have many more questions on Autonomy, but, just to position that squarely in everybody's minds, the idea around Autonomy is to really strengthen HP's capabilities tremendously in this whole notion of data.  We talked about data in San Francisco.  We will talk a lot about data, probably, today, as well, structured and unstructured.  And, therefore, Autonomy is a very important asset.

***

And let me just try to build on that and help you understand how we came to the valuation of Autonomy.  ***We have a pretty rigorous process inside HP that we follow for all of our acquisitions, which is a DCF-based model, and we try to take a very conservative view at this.  Just to make sure everybody understands. Automony will be, on day one, accretive to HP.  For FY 2012, Autonomy, once we integrate it, is accretive to HP.***

Now, we have identified five synergy possibilities – five synergy leverages on how we can build up the Autonomy business and how we can synergize it between HP and Autonomy.  And I can walk you through that, through these various elements.  But just take it from us.  We did that analysis at great length, in great detail, and we feel that we paid a very fair price for Autonomy.  And it will give a great return to our shareholders.

*** 

[WHITMORE:]  You're in the midst of repositioning [Enterprise Services].  Can you talk about where you are today in that process, what the end goal is?  What do you hope to turn EDS into?

[APOTHEKER:]  Okay.  It's not EDS anymore; it's HP Enterprise Services.  And the segment we report is that business, our enterprise services, and our technical services.  We bring it all together in the segment service that you see in the reporting.

So, what are we trying to do?  Currently, our HP EDS – former EDS business is heavily skewed towards outsourcing.  We are trying to shift this balance over time and it has to be gradual, because in service businesses, things move gradually to a more balanced portfolio approach.  We will be providing on top of our outsourcing businesses – or alongside our outsourcing businesses additional, higher-added-value service, be it clouds – we want to put a lot of focus on clouds – application migrations towards the clouds, application modernization, and, in fact, provide more IP for our customers as well.

(emphasis added).

74.    The foregoing statement by Defendant Apotheker was materially false and misleading because it was intentionally designed to quell investor concerns that H-P had overpaid for Autonomy.  In fact, Defendant Apotheker knew that H-P had overpaid for Autonomy and further knew that H-P had not, in fact, engaged in a rigorous analysis to evaluate what a reasonable price for Autonomy would be.

75.    On September 22, 2011, H-P terminated Defendant Apotheker as its CEO and announced that Defendant Whitman would take over as the Company's new President and CEO.

76.     On September 22, 2011, the Company hosted a conference call where Defendant Whitman stated the following in relevant part, "Second, the Autonomy acquisition, which I'm excited about, is proceeding as planned, and is expected to be completed by the end of the calendar year."

77.     On October 3, 2011, the Company issued a press release announcing that it had acquired control of Autonomy.  The press release stated the following in relevant part:

> Holders of 213,421,299 Autonomy shares have accepted HP's previously announced offer to purchase the entire share capital of Autonomy at a price of £25.50 per share in cash, representing approximately 87.34 percent of the current issued share capital of Autonomy.  As such, all conditions relating to the offer have now been satisfied, allowing HP to acquire control of Autonomy.
>
> ***The acquisition positions HP as a leader in the large and growing enterprise information management space***.  Autonomy's software offerings power more than 25,000 customer accounts worldwide and, as part of HP, will provide high-value business solutions to help customers manage the explosion of unstructured and structured information.  ***Autonomy offers solutions that are complementary across HP's enterprise offerings and strengthens the company's data analytics, cloud, industry and workflow management capabilities.***
>
> "We are committed to helping our customers solve their toughest IT challenges. The exploding growth of unstructured and structured data and unlocking its value is the single largest opportunity for consumers, businesses and governments," said Meg Whitman, HP president and chief executive officer.  "***Autonomy significantly increases our capabilities to manage and extract meaning from that data to drive insight, foresight and better decision making.***"
>
> As previously announced, Autonomy will operate as a separate business unit.  Dr. Mike Lynch, the founder and chief executive officer of Autonomy, will continue to lead the Autonomy business and will report to Whitman.
>
> "This is a historic day for Autonomy, our employees and the customers we serve, as we combine HP's phenomenal assets and Autonomy's specialized skills to produce systems that handle all the information in the enterprise, regardless of the format it is in," said Lynch.  "We are at the dawn of a new era when it is the 'I' in IT that is changing, not just the 'T.'"

78.     Defendant Whitman's statements concerning the Autonomy Acquisition were materially false and misleading because she and other H-P insiders knew or were reckless in disregarding that Autonomy would not provide any synergistic or other benefits to increase H-P's profitability.  In fact, H-P had ignored the concerns expressed by Defendant Lesjak and

numerous analysts and other industry giants that the Company was overpaying for Autonomy and was exaggerating any potential benefits Autonomy would have for the Company's profitability.

79.     On November 21, 2011, the Company issued a press release announcing financial results for the fiscal year ended October 31, 2011.  Also on November 21, 2011, the Company conducted a conference call with analysts.  During the call, Defendant Whitman represented the following:

> [W]e closed the Autonomy acquisition on October 3.  In the last month, we've had hundreds of leads passed between the two companies, and we've created a new information management business group that combines Autonomy, Vertica, and other HP software assets under Mike Lynch, and reports directly to me.
>
> ***
>
> Well let me just spend a moment on Autonomy.  I am really excited about this acquisition.  ***As you all know, I think it really positions HP as a leader in the Next-generation information management and analytics capabilities, as the explosion of data is making these capabilities absolutely critical.  Autonomy is a unique asset.***  It has a remarkable ability to manage unstructured information in a way that no one else in the market does.  I think that adds a lot of value not only in their space but actually across HP.
>
> So, what we've set up is Autonomy is actually running fairly autonomously (laughter) but we have done a great job I think of integrating the go-to market.  So, there are sales leads that are going from Autonomy to HP – interestingly, which we didn't expect so much of in terms of a hardware pull-through – but also from our HP sales team back to Autonomy.  We've got a clearing house that vest all those leads.  So, that what we turn over to Autonomy are really high quality leads that will allow Autonomy to grow much faster than they would have grown on their own.  That's the name of the game for 2012.
>
> There's going to be lots of other things we do together but accelerating the growth of Autonomy using the distribution capability of HP is priority number one, two and three for 2012.
>
> ***
>
> First, we increased our investment levels through fiscal-year 2011 because there are areas where HP had previously under-invested.  This is a big reason why our services margins have been coming down and remain pressured.

80.     During the call, Defendant Lesjak represented the following:

We closed the acquisition of Autonomy in October, and therefore, we had roughly one month of results in the software numbers. ***The integration is going well thus far, and we are focused on enabling our global sales force to ramp on the Autonomy product line-up, so they can begin selling Autonomy software in fiscal '12.***

\*\*\*

HP Services delivered revenue of $9.3 billion, up 2% from the prior year quarter, but down 1% in constant currency. Operating profit of $1.2 billion, or 12.8% of revenue, was down 360 basis points from the prior year. Our services turnaround will take time as we work to shift the business mix toward higher growth, higher margin services. IT outsourcing revenue of $3.9 billion was up 1% year-over-year.

81.     Defendants Lesjak's and Whitman's statements concerning the Autonomy Acquisition were materially false and misleading because she and other H-P insiders knew or were reckless in disregarding that Autonomy would not provide any synergistic or other benefits to increase H-P's profitability. In fact, H-P had ignored the concerns expressed by Defendant Lesjak and numerous analysts and other industry giants that the Company was overpaying for Autonomy and was exaggerating any potential benefits Autonomy would have for the Company's profitability.

82.     On December 14, 2011, H-P filed an annual report for the fiscal year ended October 31, 2011 on a Form 10-K with the SEC, which was signed by, among others, Defendants Whitman and Lesjak and reiterated the Company's previously announced financial results. In addition, the 2011 Form 10-K contained signed certifications pursuant to SOX by Defendants Whitman and Lesjak stating that the information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

83.     The 2011 Form 10-K stated the following in relevant part:

HP's largest acquisition in fiscal 2011 was its acquisition of Autonomy Corporation plc ("Autonomy"). As of October 31, 2011, HP owned an approximately 99% equity interest in Autonomy, and HP expects to acquire a 100% equity interest before the end of the first quarter of fiscal 2012. Autonomy is a provider of infrastructure software for the enterprise. HP reports the financial results of the Autonomy business in the HP Software segment. ***The acquisition date fair value consideration of $11 billion consisted of cash paid for outstanding common stock, convertible bonds, vested in-the-money stock***

*awards and the estimated fair value of earned unvested stock awards assumed by HP.  In connection with this acquisition, HP recorded approximately $6.6 billion of goodwill and amortizable purchased intangible assets of $4.6 billion. HP is amortizing the purchased intangible assets on a straight-line basis over an estimated weighted-average life of 8.8 years.*

84.    The 2011 Form 10-K was materially false and misleading because it overstated the fair value consideration of Autonomy as well as the amount in goodwill that H-P recorded in connection with Autonomy.

85.    On February 22, 2012, the Company issued a press release announcing financial results for the first quarter ended January 31, 2012.  For the quarter, the Company reported net earnings of $1.5 billion, or $0.73 diluted EPS, and net revenue of $30 billion as compared to net earnings of $2.6 billion, or $1.17 diluted EPS, and net revenue of $32.3 billion for the same period a year ago.  For the Company's Software segment, "revenue grew 30% year over year with a 17.1% operating margin, including the results of Autonomy.  Software revenue was driven by 12% license growth, 22% support growth and 108% growth in services."

86.    Also on February 22, 2012, the Company conducted a conference call with analysts.  During the call, Defendant Whitman represented the following:

In Services, year-over-year revenues were up 1% while operating margin declined to 10.5%.  This continuing margin pressure is Services really goes straight to a couple of our major challenges, like resource utilization and business mix.  We're focused on transitioning to more profitable services while enhancing our systems, processes and sales force.  Last quarter, we characterized Services as a long term effort.  That journey continues.

In Software, with the addition of Autonomy, revenue grew 30% year-over-year with a 17.1% operating margin.  ***The Autonomy acquisition is going well.***  And we're continuing to grow our set of assets from Information Management to our IT Performance Suite including security, management of hybrid clouds and Application Lifestyle Management.  Software is a critical part of our portfolio and of our forward-looking strategy.  It amplifies, differentiates, optimizes and secures our core infrastructure, builds on our solution capabilities and expands customer relationships.

87.    During the call, Defendant Lesjak represented the following:

So the performance that we delivered [in Services] was in line with the expectations that we set last quarter, and I think that that's an important point.  So there shouldn't be any surprises here on that.  Revenues in Services did grow 1%, it was flat, on a reported basis it was flat in constant currency while the cost

structure increased due to the necessary investments that we've been talking about in service delivery, in basically building out our bench and in investing to build out our strategic enterprise services. And I put – the services that we put in that category are services around cloud, analytics and security, as well as aps modernization. And those are the higher growth, higher margin services that we need to invest into and convert this business from being less ITO heavy where the margins are not as good, and in some service lines within ITO, the margins are very unattractive and we're deemphasizing some of the revenue in that space.

88.     On March 12, 2012, H-P filed a quarterly report for the period ended January 31, 2012 on Form 10-Q with the SEC, which was signed by Defendant Lesjak and reiterated the Company's previously announced financial results. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Whitman and Lesjak stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

89.     The Form 10-Q stated the following in relevant part:

Additionally, during the three months ended January 31, 2012, ***HP recorded additional goodwill of $224 million in the Software segment due to a change in the estimated fair values of purchased intangible assets and net tangible assets associated with the acquisition of Autonomy Corporation plc ("Autonomy").*** This increase to goodwill was partially offset by a currency translation adjustment of $106 million on goodwill related to Autonomy subsidiaries whose functional currency is not the U.S. dollar.

\*\*\*

***For the first three months of fiscal 2012, the majority of the decrease in gross intangibles was related to a $293 million change in the estimated fair value of Autonomy's purchased intangible assets acquired, $104 million of fully amortized intangible assets which have been eliminated from both the gross and accumulated amortization amounts, and a $92 million reduction in intangibles due to currency translation on intangibles related to Autonomy subsidiaries whose functional currency is not the U.S. dollar.***

\*\*\*

The Software segment contributed favorably to the total HP net revenue change primarily as a result of the acquisition of Autonomy Corporation plc.

90.     The Form 10-Q for the first quarter of 2012 was materially false and misleading because it overstated the amount of goodwill associated with and the fair value of Autonomy.

91.     On May 23, 2012, the Company issued a press release announcing financial results for the second fiscal quarter ended April 30, 2012.  For the quarter, the Company reported net earnings of $3 billion, or $1.53 diluted EPS, and net revenue of $30.7 billion as compared to net earnings of $5 billion, or $2.23 diluted EPS, and net revenue of $31.6 billion for the same period a year ago.

92.     On May 23, 2012, the Company held a conference call with analysts.  Defendant Whitman admitted that "*Autonomy had a very disappointing license revenue quarter with a significant decline year-over-year resulting in a shortfall to our expectations.*"  Further, Defendant Whitman disclosed the following:

> To help improve Autonomy's performance, Bill Veghte, HP's Chief Strategy Officer and Executive Vice President of HP Software, will tep in to lead Autonomy.  Mike Lynch, Autonomy's founder and Executive Vice President for Information Management will leave HP after a transition period.  *The market and competitive position for Autonomy remains strong, particularly in cloud offerings, and we have been flooded with a number of big deal leads.*  Bill is an experienced software leader, who will develop the right processes and discipline to scale Autonomy and fulfill its promise, although it will take a few quarters to see tangible improvement.
>
> ***
>
> Turning to Services, revenues were essentially flat year-over-year in constant currency and we stabilized margins.  While margins may fluctuate quarter-to-quarter, we believe that a 10% to 12% range is the right sustainable profit margin profile for Services through the remainder of fiscal year 2012.  We're focused on building out strategic practice areas, in could, security, information management, and application transformation.  And we're strengthening the industry alignment of our Services business, which will help us better solve customer challenges, create more customer value and deepen customer relationships.  We're excited about growing these higher-margin categories, but this is a business that continues to be challenged.  It's a journey, and we have a lot of work ahead of us in this turnaround.

93.     Defendant Whitman's statements were false and misleading because the market for Autonomy was not strong, and H-P had not been "flooded with a number of big deal leads" to sell its products related to Autonomy.  In fact, the Autonomy business was struggling and H-P would be forced to write-down over $8 billion of the value of Autonomy.

94.     On June 8, 2012, H-P filed a quarterly report for the period ended April 30, 2012 on a Form 10-Q with the SEC, which was signed by Defendant Lesjak and reiterated the Company's previously announced financial results.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Lesjak and Whitman stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

95.     The Form 10-Q stated the following in relevant part:

During the six months ended April 30, 2012, HP recorded additional goodwill of $225 million in the Software segment due to a change in the estimated fair values of purchased intangible assets and net tangible assets associated with the acquisition of Autonomy Corporation plc ("Autonomy").  HP also recorded a net increase to goodwill of $213 million as a result of a currency translation adjustment on goodwill related to Autonomy subsidiaries whose functional currency is not the U.S. dollar.

***

For the first six months of fiscal 2012, the majority of the decrease in gross intangibles was related to $428 million of fully amortized intangible assets which have been eliminated from both the gross and accumulated amortization amounts and a $293 million change in the estimated fair value of Autonomy's purchased intangible assets acquired.  The decrease to intangibles was partially offset by a net currency translation adjustment of $165 million on intangibles related to Autonomy subsidiaries whose functional currency is not the U.S. dollar.

***

The Software segment contributed favorably to the total HP net revenue change primarily as a result of the acquisition of Autonomy Corporation plc.

96.     On August 8, 2012, the Company issued a press release announcing that it expects "to record a non-cash pre-tax charge for the impairment of goodwill within its Services segment of approximately $8 billion in the third quarter of its fiscal 2012."   The press release further stated the following in relevant part:

The impairment review stems from the recent trading values of HP's stock, coupled with market conditions and business trends within the Services segment. Under accounting rules, when indicators of potential impairment are identified, companies are required to conduct a review of the carrying amounts of goodwill and other long-lived assets to determine if an impairment exists.

HP does not expect this estimated goodwill impairment charge to result in any future cash expenditures or otherwise affect the ongoing business or financial performance of its Services segment.

97.     On August 22, 2012, the Company issued a press release announcing financial results for the third fiscal quarter ended July 31, 2012.  For the quarter, the Company reported net loss of $8.9 billion, or ($4.49) diluted EPS, and net revenue of $29.7 billion as compared to net earnings of $1.9 billion, or $0.93 diluted EPS, and net revenue of $31.2 billion for the same period a year ago.  Moreover, the Company's financial results included a goodwill impairment charge of $8 billion associated with the Services segment.

98.     On August 22, 2012, the Company held a conference call with analysts. Defendant Whitman represented the following:

> ***Autonomy still requires a great deal of attention and we've been aggressively working on that business.***  Among the many changes we've instituted is a global dashboard to track Autonomy's pipeline.  A single global sales methodology, a single HP Services engagement process, and a global process to measure client satisfaction and service delivery progress.  These actions are designed to help deliver predictable results and improve after-sale customer satisfaction.

99.     Defendant Whitman's statement partially disclosed to investors the problems associated with Autonomy, and upon this news, H-P stock declined $1.57 per share or more than 8%, to close at $17.64 per share on August 23, 2012.   However, Defendant Whitman's statements continued to conceal the magnitude of problems associated with Autonomy and as such continued to be false and misleading.  Just three months later, H-P would announce that it had to write-down the value of Autonomy by over $8 billion, thus making Defendant Whitman's statement on August 22, 2012 materially false and misleading.

100.    On September 10, 2012, H-P filed a quarterly report for the period ended July 31, 2012 on Form 10-Q with the SEC, which was signed by Defendant Lesjak and reiterated the Company's previously announced financial results.  In addition, the Form 10-Q contained signed certifications pursuant to SOC by Defendants Lesjak and Whitman stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

101.    The Form 10-Q stated the following in relevant part:

Additionally, HP recorded an increase to goodwill of $249 million in the Software segment due to a change in the estimated fair values of purchased intangible assets and net tangible assets associated with the acquisition of Autonomy Corporation plc ("Autonomy").

\*\*\*

The Software segment includes $14.6 billion of goodwill, of which $7.7 billion relates to the legacy HP software business and $6.9 billion relates to the Autonomy acquisition.  Based on HP's last annual goodwill impairment review completed as of August 1, 2011, the excess of fair value over carrying value of the legacy HP software business was 38% of the carrying value, which is lower than that of HP's other reporting units.  At the time of the Autonomy acquisition in October 2011, the fair value of Autonomy approximated the carrying value.

\*\*\*

For the first nine months of fiscal 2012, the majority of the decrease in gross intangibles was related to $537 million of fully amortized intangible assets which have been eliminated from both the gross and accumulated amortization amounts and a $293 million change in the estimated fair value of Autonomy's purchased intangible assets acquired.

\*\*\*

The Software segment contributed favorably to the total HP net revenue change as a result of the acquisition of Autonomy Corporation plc.

\*\*\*

Software net revenue increased 18.4% (21.0% when adjusted for currency) and 23.3% (23.7% when adjusted for currency) for the three and nine months ended July 31, 2012, respectively.  The net revenue increase for both periods was due to revenues from acquired companies, primarily Autonomy.  For the three months ended July 31, 2012, net revenue from services, support and licenses increased by 65%, 16% and 2%, respectively.  For the nine months ended July 31, 2012, net revenue from services, support and licenses increased by 81%, 18% and 7%, respectively.

For the three and nine months ended July 31, 2012, Software earnings from operations as a percentage of net revenue decreased by 1.5 percentage points and 1.1 percentage points, respectively.  The operating margin decrease for both periods was due primarily to a lower mix of license revenue, higher deferred revenue write-downs and integration costs associated with the Autonomy acquisition, the effects of which were partially offset by rate increases in hosted license services and lower deferred revenue write-downs associated with our fiscal 2010 acquisitions than in the prior-year periods.

102.    Collectively, the statements referenced in ¶¶ 65-101 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them, including that: (i) at the time the Company had agreed in principle to acquire Autonomy, H-P was looking to unwind the deal and some insiders believed that H-P was overpaying for Autonomy; (ii) after the Autonomy Acquisition, insiders mismanaged Autonomy so that the synergistic benefits could never possibly be realized; (iii) the Company's reported goodwill and acquired intangible assets were overstated and would have to be written down; and (iv) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.    Moreover, the statements referenced in ¶¶ 65-101 above were materially false and misleading because, as a result of detailed allegations of fraud provided by a whistleblower former employee of Autonomy, as early as May 2012, HP had commenced an internal investigation regarding potential accounting manipulations at Autonomy.

**F.    THE TRUTH IS REVEALED**

103.    On November 20, 2012, the Company issued a press release announcing financial results for the fourth fiscal quarter and full year ended October 31, 2012.    For the quarter, the company reported net loss of $6.9 billion, or ($3.49) diluted EPS, and net revenue of $30 billion as compared to net earnings of $239 million, or $0.12 diluted EPS, and net revenue of $32 billion for the same period a year ago.    For the full year, the Company reported net loss of $12.7 billion, or ($6.41) diluted EPS, and net revenue of $120.4 billion as compared to net earnings of $7.1 billion, or $3.32 diluted EPS, and net revenue of $127 billion for the same period a year ago.

104.    That same day, the Company issued a press release disclosing a non-cash impairment charge of $8.8 billion related to the acquisition of Autonomy.    Significantly, the Company revealed that more than $5 billion of the impairment charge was "is linked to serious accounting improprieties, misrepresentation and disclosure failures" made by Autonomy in the anticipation of the HP acquisition.    In addition, the Company disclosed that as a result of reports by a whistleblower who was a former executive at HP, in May 2012, it had launched an

internal investigation into improper accounting practices at Autonomy.   The press release disclosed the following in relevant part:

> "HP is extremely disappointed to find that some former members of Autonomy's management team used accounting improprieties, misrepresentations and disclosure failures to inflate the underlying financial metrics of the company, prior to Autonomy's acquisition by HP.   These efforts appear to have been a willful effort to mislead investors and potential buyers, and severely impacted HP management's ability to fairly value Autonomy at the time of the deal.   We remain 100 percent committed to Autonomy and its industry-leading technology."

> Additional background:

> HP today announced a non-cash impairment charge of $8.8 billion related to Autonomy in the fourth quarter of its 2012 fiscal year.   The majority of this impairment charge, more than $5 billion, is linked to serious accounting improprieties, misrepresentation and disclosure failures discovered by an internal investigation by HP and forensic review into Autonomy's accounting practices prior to its acquisition by HP.   The balance of the impairment charge is linked to the recent trading value of HP stock and headwinds against anticipated synergies and marketplace performance.

> HP launched its internal investigation into these issues after a senior member of Autonomy's leadership team came forward, following the departure of Autonomy founder Mike Lynch, alleging that there had been a series of questionable accounting and business practices at Autonomy prior to the acquisition by HP. This individual provided numerous details about which HP previously had no knowledge or visibility.

> HP initiated an intense internal investigation, including a forensic review by PricewaterhouseCoopers of Autonomy's historical financial results, under the oversight of John Schultz, executive vice president and general counsel, HP.

> As a result of that investigation, HP now believes that Autonomy was substantially overvalued at the time of its acquisition due to the misstatement of Autonomy's financial performance, including its revenue, core growth rate and gross margins, and the misrepresentation of its business mix.

> Although HP's investigation is ongoing, examples of the accounting improprieties and misrepresentations include:

> • The mischaracterization of revenue from negative-margin, low-end hardware sales with little or no associated software content as "IDOL product," and the improper inclusion of such revenue as "license revenue" for purposes of the organic and IDOL growth calculations.

> • This negative-margin, low-end hardware is estimated to have comprised 10-15% of Autonomy's revenue.

- The use of licensing transactions with value-added resellers to inappropriately accelerate revenue recognition, or worse, create revenue where no end-user customer existed at the time of sale.

This appears to have been a willful effort on behalf of certain former Autonomy employees to inflate the underlying financial metrics of the company in order to mislead investors and potential buyers. These misrepresentations and lack of disclosure severely impacted HP management's ability to fairly value Autonomy at the time of the deal.

105.    The Company also held a conference call to discuss its financial results.  In regard to the impairment charge, Defendant Whitman stated the following in relevant part:

The majority of this impairment charge is linked to serious accounting improprieties, disclosure failures and outright misrepresentations that occurred prior to HP's acquisition of Autonomy, and the associated impact on the expected financial performance of the business over the long-term.  The balance of the impairment charge is linked to the recent trading value of HP stock.

These improprieties were discovered through an internal investigation after a senior member of Autonomy's leadership team came forward following the departure of Mike Lynch on May 23.  Based on this information, HP initiated an intense internal investigation into the allegations, including a third-party forensic review of Autonomy's historically financial results.

HP has contacted the SEC's Enforcement Division and the UK's Serious Fraud Office.  We have requested that both agencies open criminal and civil investigations into this matter.  In addition, HP intends to seek redress against various parties in the appropriate civil courts to recoup what we can for our shareholders.

106.    In part because of this news, HP stock dropped $1.59 per share or nearly 12%, to close at $11.74 per share on November 20, 2012.

107.    On November 20, 2012, *The Wall Street Journal* ("WSJ") published an article entitled, "H-P Says It was Duped, Takes $8.8 Billion Charge."  Specifically, the article stated that members of HP's due diligence team noted potential accounting irregularities at Autonomy at the time of the merger, and even considered scuttling the Autonomy deal as a result.  The article stated, in relevant part:

H-P General Counsel John Schultz said the internal investigation into the Autonomy deal began in May when he told Ms. Whitman he had just spoken with a senior executive in the Autonomy software business, who had alleged that

executives at Autonomy had been cooking the books before the acquisition. The identity of that senior executive couldn't be determined.

A spokesman for Autonomy's accounting firm, Deloitte LLP, said Tuesday: "Deloitte UK categorically denies that it had any knowledge of any accounting improprieties or any misrepresentations in Autonomy's financial statements, or that it was complicit in any accounting improprieties or misrepresentations."

\*\*\*

H-P said Tuesday that Autonomy, before it was acquired, had mischaracterized some sales of low-margin hardware as software and had recognized some deals with partners as revenue, even when a customer never bought the product.

At least one year before the H-P acquisition, an Autonomy executive brought concerns about the company's accounting practices to U.S. regulators including the SEC, according to people familiar with the matter. Autonomy didn't trade on U.S. exchanges prior to the H-P deal, so it is unclear whether U.S. agencies had jurisdiction.

H-P's internal team was aware of talk about accounting irregularities at the time the deal was struck, people familiar with the matter have said. At the time, one of these people said, H-P was looking for a way to unwind the deal before it closed, but couldn't find any material accounting issues.

\*\*\*

In May 2012, Mr. Lynch left H-P. Shortly after, the unidentified Autonomy senior executive approached Mr. Shultz. Mr. Schultz said that during a phone call to discuss other matters, the Autonomy executive asked to speak with him in person.

The pair met in a conference room at H-P's Palo Alto headquarters, where the executive provided an outline of the alleged accounting fraud, Mr. Schultz said. The executive later provided some emails and financial information that Mr. Schultz said substantiated the claim.

Working with auditing firm PricewaterhouseCoopers LLP, an H-P team re-created Autonomy's books. People familiar with the investigation said that the team found that for at least two years, Autonomy booked sales of low-margin hardware products as software and would label the cost of that hardware as marketing or other expenses, which made products appear faster growing and more profitable than they really were.

In late June 2012, Mr. Lynch met with H-P to discuss issues including "transition and obligations to the company," said Mr. Lynch's spokeswoman. She added that at the meeting, he was asked about the operation of a small number of deals, which he explained.

108.     On November 26, 2012, the *Wall Street Journal* published an article entitled, "Long Before H-P Deal, Autonomy's Red Flags" where it discussed Autonomy's aggressive accounting practices and corporate culture.   The article noted that several analysts had questioned Autonomy's accounting practices well in advance of the merger.   Specifically, the article stated the following in relevant part:

> Interviews in California and England with former Autonomy employees, business partners and attorneys close to the case paint a picture of a hard-driving sales culture shaped by Mr. Lynch's desire for rapid growth.   They describe him as a domineering figure, who on at least a few occasions berated employees he believed weren't measuring up.

> Along the way, these people say, Autonomy used aggressive accounting practices to make sure revenue from software licensing kept growing—thereby boosting the British company's valuation.   The firm recognized revenue upfront that under U.S. accounting rules would have been deferred, and struck "round-trip transactions"—deals where Autonomy agreed to buy a client's products or services while at the same time the client purchased Autonomy software, according to these people.

> "The rules aren't that complicated," said Dan Mahoney of accounting research business CFRA, who covered Autonomy until it was acquired.   He said that Autonomy had the hallmarks of a company that recognized revenue too aggressively.   He said neither U.S. nor international accounting rules would allow companies to recognize not-yet collected revenue from customers that might be at risk not to pay, which he said appears to be the case in some of Autonomy's transactions.

## VI.     FRAUD SCHEME RELATING TO INTEGRITY AND ITANIUM-BASED SERVERS

### A.     INTEGRITY SERVERS AND RELATIONSHIP TO ITANIUM CHIPS

109.     In addition to its Autonomy-related problems, H-P has engaged in a fraudulent scheme, ongoing for at least 5 years, designed to cover-up severe problems associated with its servers that run on Itanium chips, called "Integrity."   The Integrity servers are sold primarily to H-P's largest corporate customers and typically carry with them high profit margin service contracts.   Thus, although they have not accounted for a large portion of H-P's revenues, the Itanium servers have accounted for as much as 15% of H-P's profits on an annual basis.   The

Integrity servers are marketed as "Business Critical Systems" ("BCS"), and they run on H-P's proprietary software, HP-UX.

110.    Since at least late 2007, H-P has known that its Integrity servers, and any servers that run on Itanium chips, were facing imminent obsolescence.  In late 2007, Intel, which manufactures and supplies Itanium chips to H-P, informed H-P that it was planning to end its Itanium development and production because the Itanium business was no longer profitable to Intel.

111.    This news caused panic throughout H-P.  Without Intel's Itanium chips, H-P would no longer be able to manufacture and sell its Integrity servers, and its high-profit service contracts would evaporate.  Although Integrity servers themselves do not account for a large portion of H-P's revenues or profits, H-P does enjoy substantial profits from the HP-UX operating system, H-P's proprietary version of the Unix operating system.  Having customers tied to H-P's proprietary operating system was very profitable to H-P because 90% of its customers purchased support contracts, which generated billions of dollars of profit every year.  This was of particular concern to H-P, which had previously been considered the market leader in the "business critical" sphere.  Therefore, anything that would jeopardize H-P's ability to sell Integrity servers would severely impact its bottom line.

B.    THE SECRET AGREEMENT WITH INTEL TO CONTINUE THE MANUFACTURE OF ITANIUM CHIPS

112.    To avoid a mass customer migration away from Integrity and HP-UX, H-P contrived a campaign to conceal the truth about Intel's waning commitment to Itanium.  In March 2008, H-P and Intel entered into the "Itanium Collaboration Agreement" ("Itanium Agreement"), pursuant to which H-P agreed to pay Intel $440 million to prolong the life of Itanium until 2014.  H-P received no consideration for the $440 million other than Intel's commitment to continue to develop and produce the chips.  The cost for H-P to purchase the chips was extra.

113.    Notably, the Itanium Agreement included strict nondisclosure language demanding that even the very existence of the agreement must remain secret.  The secrecy of

the Itanium Agreement was critical to H-P's scheme to conceal the fact that its Integrity servers and the Itanium chips were a dying product.  Because Integrity was marketed primarily at very large customers who were making long-term, multi-million dollar purchases, they could not know that Integrity was becoming obsolete.  Typically, when customers catch a whiff that a product's life cycle has a defined end point (as did Integrity/Itanium, even pursuant to the terms of the Itanium Agreement), they will switch to a newer product that has a better chance at longevity.

114.    Furthermore, in order to keep up the ruse that Intel was actually committed to continuing Itanium chip development, H-P and Intel worked out an agreement that Intel would create an illusory roadmap "to create market perception of long term viability."  Thus, each subsequent Itanium chip released by Intel contained few, if any, technological improvements over the prior generations.  H-P knew this, but hid that fact from its investors and customers.

C.    **THE ORACLE LAWSUIT**

115.    H-P was successful in keeping the Itanium Agreement a secret until Oracle uncovered it in litigation with H-P pending in California Superior Court, Santa Clara County (San Jose), *Hewlett-Packard Company v. Oracle Corporation*, Case No. 1-11-cv-203163 (the "Oracle Litigation").  Oracle develops and sells software which runs on Itanium chips; without Oracle's software, customers would have no incentive to purchase Integrity servers, and thus one would expect similar detrimental effects to H-P's Integrity and HP-UX revenues as would occur if Intel stopped making its Itanium chips.  According to H-P, pursuant to a settlement agreement with Oracle ("Oracle Settlement"), Oracle agreed to "continue to offer its product suite for H-P platforms, and H-P will continue to support Oracle products."

116.    On March 22, 2011, Oracle announced that it would halt future development of its software products for Itanium because it had heard from Intel executives 'that Itanium was nearing the end of its life.'"  On June 15, 2011, H-P sued Oracle for breach of contract.  H-P alleged that Oracle is contractually obligated to develop software for Itanium based systems, citing to language in the Settlement Agreement.  Oracle filed counter-claims against H-P for unlawful, unfair and deceptive business practices, defamation, intentional interference with

1    contractual relations, fraud, intentional interference with prospective economic advantage and

2    certain violations of the Lanham Act relating to false and deceptive statements to the public.

3        117.    With the filing of Oracle's counterclaim complaint on December 2, 2011, the

4    Itanium Agreement, Itanium Amendment and all the problems H-P faces with regard to the

5    impending obsolescence of Integrity and its HP-UX operating system were made public.

6        D.    **H-P'S HEAVY RELIANCE ON INTEGRITY SERVERS FOR PROFITS**

7        118.    The problems associated with H-P's Integrity servers have hurt H-P.  Oracle has

8    alleged that 90% of customers who purchase HP-UX, which runs on Integrity servers, also

9    purchase support contracts from HP which generate billions of dollars of HP profit every year.

10   The website "All Things Digital reported that "[o]ngoing uncertainty in H-P's Business

11   Critical Systems business, brought on by the continuing legal fight with Oracle concerning the

12   Intel-made Itanium chip, is hurting not only the sales in its high-end Integrity line of servers,

13   but the associated service and support fees that H-P collects from customers who buy them."

14   H-P's Business Critical Systems business "has always been known to be a highly profitable

15   business; ***exactly how profitable was a closely guarded H-P secret***" (emphasis added).

16       119.    Sales in H-P's Business Critical Systems segment (of which Integrity makes up

17   the vast majority) have been on the decline.  In 2009, sales of the hardware were $2.6 billion,

18   in 2011 they had fallen by 19% to $2.1 billion and in the quarter ended January 31, 2012, sales

19   were $405 million, down 27% from the same period in 2011.  But, as was finally reported on

20   August 3, 2012, "it's not the sales that are hurting H-P the most: A half billion dollar drop in

21   sales at a company on track to do $123 billion this year isn't much to get excited about . . . it's

22   the profits."

23       120.    Legal filings made public over the course of the H-P/Oracle suit confirm that H-

24   P derives a healthy portion of its profits from ongoing service and support contracts with

25   companies that buy its Integrity servers.  Reports indicate that "H-P's owned operating profit

26   for the combined hardware, software and services tied to the business of selling and supporting

27   Itanium servers was about $2.2 billion," or about 15% of its profits.

28

121.    H-P executive Dave Donatelli frames just how important and substantial these profits are to H-P's bottom line when in a January 14, 2010 email he states, "[b]ased on the work that Vincent and I have done we have determined that the combined BCS/TS earns more than our PC Business.  This means that even though "H-P's PC business" which is "the world's largest," may account for a large portion of H-P revenues, the BCS/TS business is more profitable and more important to H-P's bottom line.

122.    Indeed, H-P sought to keep the impact of Integrity servers on its bottom line a secret, particularly beginning with the signing of the secret agreement with Intel, when H-P knew that its gravy train associated with Integrity servers was finite, and the end was near.  Thus, although H-P was reporting consistent declines in sales of Integrity servers, and declines in revenues in its Business Critical Systems business (the segment where Integrity sales are reported), H-P failed to disclose the ripple effect that those declines was beginning to have – and would continue to have with greater force – on H-P's overall profitability.

123.    Furthermore, the extent of H-P's fraudulent scheme is clear.  Although it has never openly admitted that its Integrity servers have been nearing obsolescence, there are numerous documents that were made public during the Oracle litigation that show that H-P has been very concerned about its future with the phasing out of Integrity.   Internal emails surrounding its negotiations concerning the Intel Agreement state, for example:

- "Intel dropped a bomb on us last night . . . talk of canceling" Itanium. (August 30, 2007)

- "Don't possibly signal to the world the end of [Itanium] roadmap." (September 5, 2007)

- An internal document from 2008 shows projected revenues for Itanium and predicts that 2012 would be the date of "market realization that Itanium is going EOL [end of life."

- "HP-UX [the operating system that runs on Integrity servers] is on a death march due to inevitable Itanium trajectory."  (February 26, 2009)

- "Impact of BB acquired by IBM: Isolates and exposes HP-UX as a third tier player, accelerates our decline (product/service) as customers look to consolidate vendors."  (February 26, 2009)

- "From the regions viewpoint, what they see is that we have non-competitive chip, we are delayed by more than a year, and we get no funding relief from Intel to help with margins and keep us in deals.  In short, they're not very impressed with the BCS worldwide team's ability to drive Intel.  ***The Itanium situation is one of our most closely guarded secrets and we have not wanted to let the region/filed know about it since all it would do it give them another reason not to sell.***"  (June 4, 2009)

- In an email discussing "what happens if we don't pay?" meaning, if H-P declines to pay Intel, one H-P insider states "Simple.  They shut down [Itanium] development and exit Itanium and have a round of high-fives."  (November 12, 2009)

   E.    **FALSE STATEMENTS CONCERNING INTEGRITY AND ITANIUM-BASED SERVERS AND H-P'S BUSINESS CRITICAL SYSTEMS UNIT**

124.    During the Class Period, Defendants made a number of materially false and misleading statements concerning its Integrity Servers.  Sales regarding Integrity are reported as part of H-P's "Business Critical Systems," business, which are reported in the "Enterprise Storage and Services" business segment.

125.    On February 19, 2008, H-P released its quarterly results for the first quarter 2008, which ended on January 31, 2008.  In its Form 10-Q, H-P reported that

> Enterprise Storage and Servers (ESS) reported revenue of $4.8 billion, up 9% over the prior year period fueled by ESS blades, which grew 81%.  On a year-over-year basis, industry-standard server revenue increased 11% . . . . ***Business critical systems revenue increased 1%, with Integrity systems grown of 37%*** offset by declines in PA-RISC and Alpha.  Operating profit was $673 million, or 14% of revenue, up from $453 million or 10.2% of revenue, in the prior-year period.

126.    In the February 19, 2008 analyst conference call which accompanied the 2008 first quarterly results, Defendant Lesjak stated that

> Business critical systems revenue grew by 1% year-over-year.  ***Integrity server revenue grew 37% and now represents 75% of BCS mix.***  ESS operating margin for the quarter improved 3.8 points to 14% of revenue, fueled by favorable component pricing, improved execution and expense discipline.  ***While we are pleased with the progress we have made, we can still do a better job penetrating our addressable market.***  You'll see us take actions to drive go-to-market initiatives and add sales resources to expand account coverage and strengthen our customer relationships.

127.   This statement was materially false and misleading because it suggests that sales from Integrity servers will increase, when in fact H-P knew as of the end of 2007 that Itanium-based servers were facing obsolescence.  In particular, H-P failed to disclose that Intel sought to cease development of Itanium chips, and that H-P was forced to pay Intel millions of dollars to continue Itanium chip production.

128.   On May 20, 2008, H-P released its quarterly results for the first quarter 2008, which ended on April 30, 2008.  In its Form 10-Q, H-P reported that

> Enterprise Storage and Servers (ESS) reported revenue of $4.8 billion, up 4% over the prior-year period fueled by ESS blades, which grew 68%, and storage, which grew 14%. Storage revenue growth was fueled by the high-end XP line, which grew 21%, and the midrange EVA line, which grew 17%. On a year-over-year basis, Industry Standard Server revenue was flat. **Business Critical Systems revenue increased 7%.** Operating profit was $655 million, or 13.7% of revenue, up from $452 million, or 9.8% of revenue, in the prior-year period.

129.   In the analyst conference call which accompanied the 2008 second quarterly result, Defendant Lesjak stated that "**Business-critical systems revenue posted 7% year-over-year growth, with Integrity server revenue increasing 35%.  BCS grew in every region, with significant wins in the United States.**  Business in markets such as India and China also posted strong growth as these markets build out their infrastructure."

130.   Defendant Lesjak further stated that "Enterprise Storage and Servers posted solid second-quarter operating profit of $655 million or 13.7% of revenue, up 390 basis points from the prior-year period, **led by strong performance in storage and BCS**, favorable component pricing and expense discipline."

131.   This statement was materially false and misleading because it suggests that sales from Integrity servers will increase, when in fact H-P knew as of the end of 2007 that Itanium-based servers were facing obsolescence.  In particular, H-P failed to disclose that Intel sought to cease development of Itanium chips, and that H-P was forced to pay Intel millions of dollars to continue Itanium chip production.

132.   On August 19, 2008, H-P released its quarterly results for the third quarter 2008, which ended on July 31, 2008.  For the first time, H-P did not release any information

particular to Integrity sales, but did note that Business Critical Systems revenue was up slightly

from the prior year.  In its Form 10-Q, H-P reported that

> Enterprise Storage and Servers (ESS) reported revenue of $4.7 billion, up 5%
> over the prior-year period fueled by ESS blades, which grew 66%, and Storage,
> which grew 16%.  Storage revenue growth was fueled by the mid-range EVA line
> and the low-end MSA line, which each grew by 19% on a year-over-year basis,
> Industry Standard Server revenue grew by 2%. **Business Critical Systems
> revenue increased 2%.** Operating profit was $544 million, or 11.5% of revenue,
> up from $507 million, or 12.2% of revenue, in the prior-year period.

133.    In the analyst conference call which accompanied the 2008 third quarter results,

Defendant Lesjak stated that "Business-critical systems revenue grew 2% with Integrity

revenue increasing 18%."

134.    These statements concerning Integrity and the Business Critical Systems unit

were materially false and misleading because it suggests that sales from Integrity servers

would increase, when in fact H-P knew as of the end of 2007 that Itanium-based servers were

facing obsolescence.   In particular, H-P failed to disclose that Intel sought to cease

development of Itanium chips, and that H-P was forced to pay Intel millions of dollars to

continue Itanium chip production.

135.    On December 18, 2008, H-P filed its form 10-K for the 2008 fiscal year, which

ended November 30, 2008.  H-P noted that although Business Critical Systems revenue was

flat in 2008 as compared to 2007, revenue from Integrity servers had grown. H-P provided the

following description of its Business Critical Systems business:

> Business critical systems include Itanium_(2)-based Integrity servers running on
> the HP-UX, Windows_, Linux, OpenVMS and NonStop operating systems,
> including the high-end Superdome servers and fault-tolerant Integrity NonStop
> servers. Business critical systems also include the Reduced Instruction Set
> Computing (''RISC'')-based servers with the HP 9000 line running on the HP-
> UX operating system, HP AlphaServers running on both Tru64 UNIX_(3) and
> OpenVMS, and MIPs-based NonStop servers.  **During 2008, we continued to
> transition all Business Critical Systems platforms to Itanium-based servers.**

> During fiscal 2007, ESS contributed unfavorably to our total company's
> weighted-average change in gross margin while the ESS gross margin remained
> stable.  This stability was due primarily to improved cost management, which was

offset by an ongoing mix shift to lower-margin Integrity products within business critical systems and a continued mix towards industry standard servers.

Business critical systems net revenue growth was flat in fiscal 2008 compared to fiscal 2007.  Integrity servers net revenue grew 22% in fiscal 2007 and represents 79% of the business critical systems revenue mix, up from 64% in fiscal 2007. The increase was offset by revenue declines in the PA-RISC product line and the planned phase-out of our Alpha Server product line.  ***The contribution of Integrity server revenue to the business critical systems revenue mix is currently within the range expected in future periods.***  Integrity servers revenue in fiscal 2008 also included revenue from Montvale-based Integrity servers.

Business critical systems net revenue decreased 3% in fiscal 2007 compared to fiscal 2006.  The decrease was due primarily to revenue declines in the PA-RISC product line and the planned phase out of our Alpha server product line.  ***The declines were partially offset by strong net revenue growth in our Integrity servers, which represented 64% of the business critical systems revenue mix in 2007, up from 37% in fiscal 2006.  We expect revenue mix from Integrity servers to continue to grow as customers migrate from PA-RISC and Alpha products.***

136.    The foregoing statements in ¶135 were false and misleading because H-P knew as of late 2007 that Integrity servers were facing obsolescence and thus could not have expected "revenue mix from Integrity servers to continue to grow."  Furthermore, statements that H-P was transitioning its customers to Itanium-based servers were false and misleading because H-P knew that demand for Itanium-based servers was dwindling as it was facing obsolescence.  H-P failed to disclose that it had been forced to pay Intel millions of dollars in order to continue making the Itanium chip,

137.    The foregoing statements in ¶135 were also false and misleading because they further failed to disclose the enormous impact a decline in revenues from the Integrity servers would have on H-P's overall profitability.  Indeed, H-P had been reporting declining revenues for Business Critical Systems throughout 2009, but did not report revenues for the Integrity servers.  In particular:

- On February 18, 2009, H-P released its quarterly results for the first quarter 2009, which ended on January 31, 2009.  H-P stated that its Business Critical revenues declined 17% from the same quarter in the prior year.

1  • On May 19, 2009, H-P released its quarterly results for the second quarter 2009,

2  which ended on April 30, 2009.  H-P stated that its Business Critical Systems

3  revenues declined 29% from the same quarter in the prior year.

4  • On August 18, 2009, H-P released its quarterly results for the third quarter

5  2009, which ended on July 31, 2009.  H-P stated that its Business Critical

6  Systems revenues declined 30% from the same quarter in the prior year.

7  • On November 18, 2009, H-P released its quarterly results for the fourth quarter

8  2009, which ended on October 31, 2009.  H-P stated that its Business Critical

9  Systems revenues declined 33% from the same quarter in the prior year.

10  138.   The foregoing statements in ¶ 137 demonstrate that H-P's prior statements that

11  it expected more of its users to transition to Integrity servers, and that it expected the revenue

12  mix in Business Critical Systems to remain the same were false and misleading.

13  139.   The foregoing statements in ¶ 137 are themselves false and misleading because

14  they failed to inform investors that it was Integrity's increasing obsolescence that was driving

15  the decline in Business Critical Systems.  Moreover, H-P failed to correct the erroneous

16  statements it had made in its Form 10-K for the 2008 fiscal year concerning its expectation that

17  Integrity servers, which had formerly been bolstering Business Critical Systems revenues,

18  would continue to increase, and that the highly profitable Integrity servers would make up the

19  same percentage of sales in Business Critical Systems that it had been doing prior to 2009.

20  140.   In its Form 10-K for the year ended 2009, released on December 17, 2009, H-P

21  finally admitted that its Integrity server revenues were declining, but it falsely attributed that

22  decline to a weak economy.  In particular, H-P said the following about its Business Critical

23  Systems segment:

24       Business critical systems include Itanium_(2)-based Integrity servers running on
         the HP-UX, Windows_, Linux, OpenVMS and NonStop operating systems,
25       including the high-end Superdome servers and fault-tolerant Integrity NonStop
         servers. Business critical systems also include the Reduced Instruction Set
26       Computing (''RISC'')-based servers with the HP 9000 line running on the HP-
         UX operating system, HP AlphaServers running on both Tru64 UNIX_(3) and
27

28

OpenVMS, and MIPs-based NonStop servers. ***During 2009, we continued to transition all business critical systems platforms to Itanium-based servers.***

Business Critical Systems delivers mission-critical Converged Infrastructure with a portfolio of HP Integrity servers based on the Intel Itanium processor that run the HP-UX and OpenVMS operating systems, as well as HP Integrity NonStop solutions. Our Integrity servers feature scalable blades built on a blade infrastructure with HP's unique Blade Link technology and the Superdome 2 server solution. Business Critical Systems also offers HP's scale-up x86 ProLiant servers for scalability of systems with more than four industry standard processors. In addition, ***HP continues to support the HP9000 servers and HP AlphaServers by offering customers the opportunity to upgrade these legacy systems to current HP Integrity systems***.

Business Critical Systems offers HP Integrity servers based on the Intel Itanium-based processor as well as HP Integrity NonStop solutions.

ESS net revenue decreased in fiscal 2009 from fiscal 2008 driven by declines in our industry standard servers ("ISS"), business critical systems and storage business units. The revenue declines were due primarily to the economic slowdown and overall weak demand environment.

***Business Critical Systems net revenue decreased 27% in fiscal 2009 compared to fiscal 2008 driven by a decline in Integrity server revenue due to weaker market conditions and by the planned phase-out of the PA-RISC and Alpha Server product lines.***

141.    The foregoing statements in ¶140 were false and misleading because they failed to inform investors that it was Integrity's increasing obsolescence that was driving the decline in Business Critical Systems, and because they falsely attributed declines in sales to a weak economy.  Moreover, H-P failed to correct the erroneous statements it had made in its Form 10-K for the 2008 fiscal year concerning its expectation that Integrity servers, which had formerly been bolstering Business Critical Systems revenues, would continue to increase, and that the highly profitable Integrity servers would make up the same percentage of sales in Business Critical Systems that it had been doing prior to 2009.

142.    In its quarterly earnings announcement on August 19, 2010 for the third quarter of 2009 ended July 31, 2010, H-P reported a 15% decline in Business Critical Systems revenue.  In the analyst call on August 19, 2010 which accompanied the third quarter 2010 announcement, Defendant Lesjak noted that despite that decline, the "new Superdome

products," which was a new line of servers that would run on the Itanium chip, were to begin shipping in the fourth quarter of 2010.

143.   Defendant Lesjak's statements concerning the new Itanium servers were false and misleading because she knew that all servers that run on Itanium chips were facing obsolescence, and she failed to disclose that H-P's partners, including Intel, wished to stop making the other products that were required for them to run.  Furthermore, it was false and misleading for Defendant Lesjak to attribute declining revenues in the Business Critical Systems segment to an upcoming release of a new product.

144.   In its quarterly earnings announcement on November 19, 2010 for the third quarter of 2010 ended October 31, 2010, H-P did reported a 10% increase Business Critical Systems revenues from the prior year.  In the analyst call on November 19, 2010 which accompanied the third quarter 2010 announcement, Defendant Lesjak highly touted the new Superdome servers, which run on the Itanium chip.  Defendant Lesjak stated:

> Within the Business Critical Systems group, we successfully launged the Integrity Superdome 2, as the flagship solution of the mission-critical converged infrastructure.  Superdome 2 delviers best-in-class system level performance and scalability, while improving resiliency more than four times over the original Superdome.  Business Critical Systems revenue grew 10% year-over-year with strong growth in the telecom sector in the Americas, and more balanced growth across verticals in other regions.

145.   It was false and misleading for Defendant Lesjak to tout the new Itanium servers because she knew that all servers that run on Itanium chips were facing obsolescence, and she failed to disclose that H-P's partners, including Intel, wished to stop making the other products that were required for them to run.

F.   **THE TRUTH ABOUT INTEGRITY AND ITANIUM-BASED SERVERS EMERGES**

146.   In the middle of 2011, H-P could no longer hide the truth that sales from its Integrity servers were declining rapidly and would likely never recover since all servers that run on the Itanium chip were facing obsolescence.  As H-P disclosed worse and worse news about its Integrity servers, and in turn its Business Critical Systems business, investors reacted

negatively and the price of H-P stock declined.  However, H-P's fraudulent scheme persisted, as it continued to blame other factors for the decline in its business, even though it had known for years that Integrity servers would be outdated by 2011.

147.    In its August 18, 2011 earnings announcement for the third quarter of 2011 ended July 31, 2011, H-P reported that Business Critical Systems revenue declined 9% year-over-year.  In the earnings call that accompanied the third quarter report, Defendant Lesjak stated: "*[t]he challenge to our Business Critical Systems business due to the Oracle Itanium issue is real and we are addressing that*."  She further stated, "[i]n Business Critical Systems, we firmly believe that HP Itanium-based-server platform is by far the best in the industry and we have fully committed to its future.  In fact, it is the strength of this platform that is likely behind Oracle's approach to drive customers away from HP technology."

148.    These statements began to reveal to investors the true problems associated with the obsolescence of the Integrity servers.  Upon news of the "real" challenges with the Itanium-based-server platform, the price of H-P stock declined over 20%, from a close of $29.51 on August 18, 2011 to a close of $23.60 on August 19, 2011.

149.    However, H-P continued to perpetrate the fraud concerning Integrity servers by touting the strength of its Itanium based servers and its commitment to the future of Itanium-based servers.  H-P also erroneously blamed Oracle for its problems with Integrity.

150.    On November 21, 2011, H-P continued to release partial corrective disclosures concerning its Integrity servers.  It announced its results for the fourth quarter of 2011 ended October 31, 2011.  H-P reported a decline of 23% year-over-year in Business Critical Systems. Defendant Lesjak  stated in the earnings call that this decline was "*primarily due to a decline in our Itanium-based servers.  Our ability to close deals has been impacted by Oracle's Itanium decision*, and we are working diligently to enforce the commitments that Oracle has made to our customers and to HP."

151.    Defendant Lesjak further stated that "[f]rom a business perspective, *we expect the decline in our business critical systems business will remain headwind throughout the year*."

51

152.     During the November 21, 2011 call, H-P for the first time acknowledged the ripple effect that a decrease in sales of Integrity servers would have on its overall business. Defendant Lesjak stated, "**_Moving on to margin_**.  In fiscal 2012, we will continue to be focused on profitable revenue, but we expect **_our margins will be impacted by several factors_**. First, the overall decline in revenue will impact margins at the company level. Second, we are seeing a competitive pricing environment across our transactional businesses.  Third, **_we expect an impact due to the lower mix of business critical systems_**."

153.     Thus, in the November 21, 2011 call, H-P for the first time acknowledged that the importance that business critical systems had on H-P's overall profitability, a fact that had been concealed prior to this date.

154.     Again, investors reacted negatively to the bad news concerning business critical systems and the price of H-P's stock declined approximately 5% over two days, from a close of $27.99 on November 18, 2011 (a Friday) to a close of $26.65 on November 22, 2011 (the day after the earnings call).

155.     H-P continued to acknowledge problems concerning its Itanium-based servers throughout 2012.  On February 22, 2012, H-P released its quarterly report for the first quarter 2012 ended January 31, 2012.   It announced a 27% decline in Business Critical Systems revenues.  During the accompanying earnings call, Defendant Lesjak stated, "Business Critical Systems revenues also declined as we continued to address the Oracle Itanium situation."

156.     Defendant Lesjak further stated, "Overall, Business Critical Systems revenue declined 27% year-over-year.  Within BCS, our Mission Critical x86 and Nonstop products grew double digits, **_but not by enough to counteract the impact of continuing Itanium challenges.  With respect to our Itanium portfolio, we are working diligently to enforce the commitments that Oracle has made to our customers and to HP._**"  Defendant Lesjak added that "we will continue to see a headwind in Business Critical Systems due to the Itanium challenges."

157.     Again, H-P admitted that there would be a ripple effect from the decline of the revenues from Itanium-based servers.  Defendant Lesjak stated, "**_we continue to have an_**

*impact [on margins] due to a lower mix of Business Critical Systems revenue*.”  The effect was clear:  H-P reported an overall 44% decline in GAAP net earnings.

158.  Once again, investors took the news concerning the problems with Itanium-based servers and its impact on H-P’s overall profitability badly.  The price of H-P stock declined 6.5%, from a close of $28.94 on February 22, 2012 to a close of $27.05 on February 23, 2012.

159.  Similar news was reported in H-P’s earnings announcement for the second quarter 2012 ended April 30, 2012.  H-P reported a 23% year-over-year decline in Business Critical Systems revenues.  H-P’s GAAP net earnings declined 31% as compared to the same quarter in 2011.

160.  During the accompanying earnings call on May 23, 2012, Defendant Lesjak stated, “*Business critical systems, not surprisingly, still facing challenges from the Oracle Itanium issue.*”  And again, Defendant Lesjak acknowledged the ripple effect this would have on H-P’s profit margins, stating “*we expect continued decline in Business Critical Systems revenue and the resulting pressure on [Enterprise Solutions & Storage Networks] margins.*”

161.  In response to a question from Keith Bachman, an analyst at BMO Capital Markets, Defendant Whitman discussed operating margins and stated that an “*ongoing headwind from a lower mix from Business Critical Systems [would] continue to put pressure on [H-P’s profit margins].*”

162.  On August 22, 2012, H-P announced its earnings for the third quarter 2012 ended July 31, 2012.  It reported a 16% decline in Business Critical Systems revenue, and Defendant Lesjak attributed that decline to “Itanium revenue declines,” even though the “first ruling in the Oracle Itanium case” had gone in H-P’s favor.

163.  This additional news of further declines in revenues from H-P’s Itanium-based servers caused the price of H-P’s stock to decline 8.12%, from a close of $19.20 on August 22, 2012, to a close of $17.64 on August 23, 2012.

164.  Finally, in its November 20, 2012 earnings call to release results for the fourth quarter of 2012 ended October 31, 2012, H-P reported a 25% decline in business critical

1   systems revenue, year-over-year, and attributed that decline to the "persistent Itanium revenue

2   decline."

3       165.   During the earnings call, Defendant Lesjak again acknowledged the huge ripple

4   effect that a decline in business critical systems sales had on H-P's overall profitability.   In

5   response to a question from Brian Alexander, an analyst from Raymond James & Associates,

6   Defendant Lesjak stated, "*[W]hat's putting pressure on margins is the continued decline in*

7   *business critical systems related to Itanium.*"

8       166.   Upon news of the fourth quarter earnings results (as well as the problems with

9   Autonomy, as alleged herein), the price of H-P's stock declined 12%, from a close of $13.30

10  per share on November 20, 2012 to a close of 11.71 on November 21, 2012.

11  **VII.   CLASS ACTION ALLEGATIONS**

12      167.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

13  Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Class A

14  common stock of H-P between February 20, 2008, and November 20, 2012, inclusive, and who

15  were damaged thereby (the "Class").   Excluded from the Class are Defendants, the officers and

16  directors of the Company during the Class Period, members of their immediate families and

17  their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or

18  had a controlling interest, and Defendants' insurers.

19      168.   The members of the Class are so numerous that joinder of all members is

20  impracticable.   Throughout the Class Period, H-P's common shares were actively traded on the

21  New York Stock Exchange.   As of November 30, 2012, the Company had approximately 1.95

22  billion shares of Class A stock issued and outstanding.   While the exact number of Class

23  members is unknown to Plaintiff at this time and can only be ascertained through appropriate

24  discovery, Plaintiff believes that there are thousands of members in the proposed Class that are

25  geographically dispersed throughout the United States and abroad.   Members of the Class may

26  be identified from records maintained by H-P or its transfer agent and may be notified of the

27  pendency of this action by mail, using the form(s) of notice customarily used in securities class

28  actions.

169. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

170. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the numerous questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted to disclose material facts;

(c)   whether Defendants acted with scienter;

(d)   whether reliance upon Defendants' alleged false statements can be presumed pursuant to the fraud-on-the-market rule;

(e)   whether the Individual Defendants were "control" persons of H-P;

(f)   whether the Insider Trading Defendants traded in H-P stock while in possession of material adverse non-public information;

(g)   whether and to what extent the market price of H-P's stock was artificially inflated during the Class Period as a result of Defendants' violations of the securities laws; and

(h)   to what extent the members of the Class have sustained damages resulting from Defendants' violations, and the proper measure of damages.

171. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for many members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII.    PRESUMPTION OF RELIANCE

172.    At all relevant times, the market for H-P's Class A common stock was an efficient market for the following reasons, among others:

        (a)    H-P's Class A common stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

        (b)    As a regulated issuer, H-P filed periodic public reports with the SEC and the NYSE;

        (c)    H-P regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

        (d)    H-P was followed by a number of securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

173.    As a result of the foregoing, the market for H-P Class A common stock promptly digested current information regarding H-P from all publicly available sources and reflected such information in the stock price.

174.    Under these circumstances, all purchasers of H- Class A common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## IX.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

175.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements

because at the time each of those forward-looking statements was made, the particular speaker knew that the statement was false, and/or the statement was authorized and/or approved by an executive officer of H-P who knew the statement was false when made.

**X.     CLAIMS FOR RELIEF**

## COUNT I
### VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10(B)-5 PROMULGATED THEREUNDER, BASED ON FALSE AND MISLEADING STATEMENTS CONCERNING AUTONOMY
### (AGAINST H-P AND DEFENDANTS WHITMAN, APOTHEKER, LESJAK, MURRIN)

176.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

177.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Defendants H-P, Whitman, Apotheker, Lesjak and Murrin, by Plaintiff on behalf of himself and the Class.

178.    During the Class Period, the Defendants named in this Count carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding H-P business, operations, management, revenues, income and earnings  and the intrinsic value of H-P common stock; (ii) artificially inflate the price of H-P shares; and (iii) cause Plaintiff and other members of the Class to purchase H-P common stock at artificially inflated prices.

179.    In furtherance of this unlawful scheme, plan and course of conduct, the Defendants named in this Count, jointly and individually (and each of them), by the use, means, or instrumentalities of interstate commerce and/or of the mails, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading.    In particular, these Defendants made material false or misleading public statements concerning Autonomy as detailed above in ¶¶ 65-101.

180.    The Defendants named in this Count had actual knowledge of the false and misleading nature of their misrepresentations and omissions, or acted with deliberate disregard for the truth.  These Defendants' material misrepresentations and/or omissions were done knowingly or with deliberate recklessness, for the purpose and effect of concealing the true

nature of H-P's business from the investing public and supporting the artificially inflated price of its Class A common stock.  These Defendants, if they did not have actual knowledge of their misrepresentations and omissions, deliberately and recklessly refrained from taking those steps necessary to discover whether those statements were false or misleading.

181.   As a result of the Defendants' material false and misleading statements and failure to disclose material facts, the market price of H-P Class A common stock was artificially inflated throughout the Class Period.  In ignorance of this artificial inflation, and relying directly or indirectly on the false and misleading statements made by the Defendants and/or upon the integrity of the market in which the securities trade, Plaintiff and the other members of the Class purchased H-P Class A common stock during the Class Period at artificially high prices.

182.   At the time of their Class Period purchases of H-P Class A common stock, Plaintiff and the other members of the Class were ignorant of the false and misleading nature of the Defendants' statements, and were unaware of the material facts the Defendants were withholding from the investing public.  Had Plaintiff and the other members of the Class and the marketplace known the truth, they would not have purchased H-P Class A common stock during the Class Period, or, if they had purchased such stock, they would not have done so at the artificially inflated prices which they paid.

183.   As the true facts that had been misrepresented and/or concealed by the Defendants began to be publicly revealed, the market price of H-P's Class A common stock dropped as the artificial inflation began to be removed from the stock price, causing losses and damage to Plaintiff and the Class.

184.   By virtue of the foregoing, each of the Defendants named in this Count has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

185.   As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

---

# COUNT II
## VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10(B)-5 PROMULGATED THEREUNDER, BASED ON FALSE AND MISLEADING STATEMENTSCONCERNING INTEGRITY, BUSINESS CRITICAL SYSTEMS AND ITANIUM-BASED SERVERS
### (AGAINST WHITMAN HURD, APOTHEKER, LESJAK AND MURRIN)

186. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

187. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against H-P and Whitman, Apotheker, Lesjak, Murrin and Hurd by Plaintiff on behalf of himself and the Class.

188. During the Class Period, the Defendants named in this Count carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding H-P's business, operations, management, revenues, income and earnings and the intrinsic value of H-P common stock; (ii) artificially inflate the price of H-P shares; and (iii) cause Plaintiff and other members of the Class to purchase H-P common stock at artificially inflated prices.

189. In furtherance of this unlawful scheme, plan and course of conduct, the Defendants named in this Count, jointly and individually (and each of them), by the use, means, or instrumentalities of interstate commerce and/or of the mails, made false and misleading statements of material fact concerning H-P's financial condition and results, and omitted to disclose material facts to investors that they were required to disclose in order to make their statements concerning H-P's financial condition and results not misleading.

190. The Defendants named in this Count had actual knowledge of the false and misleading nature of their misrepresentations and omissions, or acted with deliberate disregard for the truth. These Defendants' material misrepresentations and/or omissions were done knowingly or with deliberate recklessness, for the purpose and effect of concealing H-P's true financial condition and future business prospects from the investing public and supporting the artificially inflated price of its Class A common stock. These Defendants, if they did not have actual knowledge of their misrepresentations and omissions, deliberately and recklessly

1    refrained from taking those steps necessary to discover whether those statements were false or

2    misleading.

3        191.    As a result of these Defendants' material false and misleading statements and

4    failure to disclose material facts concerning H-P's financial condition and results, the market

5    price of H-P Class A common stock was artificially inflated throughout the Class Period.  In

6    ignorance of this artificial inflation, and relying directly or indirectly on the false and

7    misleading statements made by the Defendants and/or upon the integrity of the market in

8    which the securities trade, Plaintiff and the other members of the Class purchased H-P Class A

9    common stock during the Class Period at artificially high prices.

10       192.    At the time of their Class Period purchases of H-P Class A common stock,

11   Plaintiff and the other members of the Class were ignorant of the false and misleading nature

12   of the Defendants' statements, and were unaware of the material facts the Defendants were

13   withholding from the investing public.  Had Plaintiff and the other members of the Class and

14   the marketplace known the truth, they would not have purchased H-P Class A common stock

15   during the Class Period, or, if they had purchased such stock, they would not have done so at

16   the artificially inflated prices which they paid.

17       193.    As the true facts that these Defendants had misrepresented and/or concealed

18   concerning H-P financial condition and results began to be publicly revealed, the market price

19   of H-P's Class A common stock dropped as the artificial inflation began to be removed from

20   the stock price, causing losses and damage to Plaintiff and the Class.

21       194.    By virtue of the foregoing, each of the Defendants named in this Count has

22   violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

23       195.    As a direct and proximate result of these Defendants' wrongful conduct,

24   Plaintiff and the other members of the Class suffered damages in connection with their

25   respective purchases and sales of the Company's common stock during the Class Period.

26

27

28

## COUNT III
### VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT
### AGAINST THE INDIVIDUAL DEFENDANTS

196.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

197.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants by Plaintiff on behalf of itself and the Class.

198.    Each of the Section 20(a) Defendants was a controlling person of H-P within the meaning of Section 20(a) of the Exchange Act.    Each had direct and supervisory involvement in the day-to-day operations of the Company and had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

199.    H-P violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint, and as a direct and proximate result of those violations, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's Class A common stock during the Class Period.

200.    By virtue of their control of H-P, each of the Section 20(a) Defendants is jointly and severally liable pursuant to Section 20(a) of the Exchange Act for H-P's violations of Section 10(b) and Rule 10b-5, to the same extent as H-P.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.    Declaring and determining that each of the Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.    Awarding Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

1    E.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

2  this action, including but not limited to attorney's fees and fees and costs incurred by

3  consulting and testifying expert witnesses; and

4    F.    Granting such other and further relief as the Court deems just and proper.

5  **XI.    JURY TRIAL DEMANDED**

6              Plaintiff hereby demands a trial by jury.

7

8    Dated: January 18, 2013

9                                     JØN C. FURGISON
                                      LAW OFFICES OF JON C. FURGISON
10                                    444 Longfellow Avenue
                                      Hermosa Beach, CA 90254
11                                    Tel:    310-356-6890

12                                    *Counsel for Plaintiff*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

62